Mr. Justice Livingston
delivered the opinion of the
This is.an appeal from the circuit court for the Southerji District óf New-,York.
This ship was libelled for taking On board, at the Island of Jamaica, with the knowledge of the master, .51 puncheons of rum, 23 barrels .of lime?, and 20 barrels of pimento, with intention to import the same into the United States, • contrary to the provisions, of an act of. Congress interdicting commercial intercourse between Great Britain and the United States., *61 passed the 1st of-March, .1809, and the cargo was libel» led'for an importation into the United States, in violation of the provisions of tjie same law.
• A; claim was interposed by John Troup, of the city of New-York, merchant, which denies the allegation of the libel, as to the intention with which the articles mentioned in the libel were put on board at Jamaica; and as to the importation, he states, that on or about the 6th of October, 1811, the said ship, with the said cargo on board, being on the high seas on the American coast about five leagues distant from land, and having lost .her rudder, and being otherwise disabled, was, by stress of weather, compelled to put into the port of New York, contrary io the will and, design of the master, and against the express orders of the claimant, as owner thereof, communicated to the said master before his arrival.
On board the vessel were two manifests of the cargo, both of which. stated the cargo to have been laden on -board at Montego bay, in Jamaica; but one of them declared her destination to be. Amelia Island, and the other New-York. The latter was' delivered to an officer of the customs, and a certificate by him. endorsed thereon, stating that fact, dated the, 14th October, 1811. The other manifest was exhibited at the custom-house ' in New-York, on the 25th October, 1811, at which time the master took the oath usual on such occasions, stating that the said manifest contained a true account, of all the goods on hoard, and that there were not any goods on board, the importation of which into the United States, was prohibited by law.
*62 John Davison, the master, deposed, that ne was.with-the said ship at Jamaica,-in August, 1811: That his orders from the, claimant' were not to take on .board at Jamaica any. West India produce for the United States. That the. consignee of the said ship,, the Nor them. Liberties ^ (evidently a mistake for the New-York,) insisted upon it that he should take a cargo of West-I-ndia produce on board, stating it, as his opinion, that the non-intercourse law would probably bé repealed before he could arrive at New-York, and' that,, at any rate, he could stand off and; on Sandy Hook until he should receive the orders of his owner' how to proceed. That he was thus induced to take the said cargo on board, with -which he .sailed with orders -from the consignee,, and with intention to obey them, not to attempt to ■ come into the port of New-York unless he received from the owner directions off •Sandy Hook so to d.o; that on the 6th of October, in the same year, while on the voyage from Jamaica, théy had a severe gale of wipd from the south-west, varying to the southward and eastward, accompanied with a,very heavy sea, which continued nearly twenty hours, in the course of which they split the foresail and-carried away the rudder. That on the 11th day of October, they njade soundings about 40 miles to the southward of Sandy Hook, where "he received a letter from the owner by a pilot-boat, the contents of which he communicated to the crew, and told them he should wait off the Hook until he received farther orders from" the ' owner ; but they declared that the rudder was in such a state that it was unsafe to remain in her at sea, and' that they would leave the *63 ship in the pilot boat unless he would bring her into port. That-* in his opinion, it would have been dangerous and very unsafe to continue at sea. with the said ship in the condition in'which the rudder then was, and he, therefore, consepted: to bring, hey into New. York, believing that it was necessary to do so for the preservation of the cargo and the lives of the people on bbard; that'he was towed into New-York, by a pilot-boat, as the pilot would not take charge of the ship unless-she was towedi.
The letter of the owner, referred to in the. master’s testimony, is dated in New-York,..the third of- October, 1811, and is- addressed to him as follows :—
<fNot knowing if yo.u have rum in, I.take this pre^ caution by every boat; if you have rum, you are to stand off immediately at least four leagues,- and keep your ship in as good a situation as you can,, either for bad weather or to c.ome in if ordered ;■ you'must get th‘e pilot to bring up all the letters for- me, &c. also, a letter from yourself, stating .the state of your ship, provisions, &c and bring them to town as soon as possible ; give me your opinion of’your crew, if you think they can be depended on if wfe' find it necessary to alter our-port of departure. If you' have rum in, I- expect the ship must go tc Amelia Island, or some other port, as they seize all that Comes here.- You may expect to see or hear from me in a day or two after your being off, you keeping the Highlands N. ,W. of you I think will bé a good birth. If you are within-thyee leagues of the land you are-liable to seizure by any armed ves^ sel.”
On the 18th of October, 1811, a survey .was made’ *64 of the New-York,’by the board of wardens, which stated the rudder gone; the stern post and counter plarik injured, the . oakujm worked out, the main cap split and settled, fore-topsailyards sprung, pallpits broken ; fore-topsail sheet bill, started and broken. This injury'was stated by .the master toi-he wardens to have happened in a gale, in lat. 27° SO" N. and long. 80 W-The wardens gave it as their opinion, that the said vessel ought to be unloaded andhove put to repair her damages'before she could proceed to sea in safe ;ty.
On the 7th of November, of the same year, after the Newryork was unloaded, the wardens again, surveyed her; and reported, the middle rudder, brace broken, the crown of the lower brace gone. Some of the sheathing fore ánd aft gone, the rudder badly chafed, and so much injured, as not to be fit to be repaired.
On this evidence, the district court pronounced a decree of restitution. From this sentence the United States appealed to the circuit court, held for the south-era district of New-Ybrk, in the second circuit, where that'sentence was reversed. From this last decree, an appeal is made to this court, whose • duty it now is to inquire which of these sentences is correct.
If the articles in question were taken on board with the intention of importing the same into , the United States, and with thé owners or master’s knowledge, a •forfeiture of the vessel must be the consequence, whether she were forced in by stress' of weather or not; and even if no such intention existed at the. time of loading at Jamaica, the f ame consequence will at *65 tach to the goods, if it shall appear that the. coming in of the vessel was voluntary .on the part of the master
Thcclaimant has first endeavoured to clear the transaction of all illegality in its inception, and thinks he has offered testimony sufficient to satisfy the court that there was no intention at the time of loading at Jamaica, to import the cargo into the United Statés.
When an act takes place, which in itself, and unexplained, is a violation of law, and the inducements to such infraction are .great, it will not be thought un reasonable in a court,1 to expect from a party who seeks relief against its consequences, the most satisfac lory proofs of innocence, especially, as stich proof will generally be within his reach. .If then; any papers, which in the course of sqch a transaction must have existed, are not produced, or if any others which come to light, do not correspond with the master’s relation; and especially, if all the witnesses who -are in the power, and many .of them in the interest, and tinder the-influence o£the party, are omitted tobe examined, when it is impossible that they should not be intimately acquainted with the most material circumstances ; and instead of this,-the chief, if not only reliance of the claimant, is placed on the evidence of a party, who, if the allegations of. the libel be true, is. himself liable to á very heavy penalty ; when such a case occurs, a court must'be expected to look at the proofs before it, .with more -than ordinary suspicion and distrust.
‘In this case, there was an importation which, prima facie, was against law, and was in the same degree *66 evidence of an original intention to import; the burthen then, of showing the absence of spchan intention, was thrown upon apd assumed by the claimant. In doing this, he satisfies with the examination of the master ; who states, that he had orders from his own* er, not to take on board at Jamaica any W' st India produce for the United States. What is become of these orders ? Does a master sail on .a foreign voyage with verbal instructions only ? This is. not the common course of business. Instructions to a master of a vessel are generally in writing; and fordhe owners greater security, there is always left with him, a copy certified or acknowledged by the former. If so, why are they hot produced ? They would speak for themselves,' and be entitled' to more credit than the declarations of a person so deeply interested to misrepresent the transaction, as-this witness is. The court, therefore, might well throw out of the case the little that is said of these instruction, so long as they are not produced; and it is not pretended that they were not reduced to writing, or if they were, that they are lost; which, indeed, is not a very supposable event, if the ordinary precautions ■ on this occasion have been observed. But notwithstanding these very positive orders, the master, in direct violation of them, and-at the hazard of the most serious consequences to himself, takes on hoard a' cargo expressly prohibited by his owner, in- compliance with the directions and opinion of a consignee, whose name is also withheld, and who does not appear tó have had any right to interfere in this way. So great a responsibility would have attached upon such *67 a palpable breach of orders, that it is a good reason for doubting whether they ever existed. Nor is this part of the master’s testimony verified by the. claim, which observes a profound silence in relation to these or any other orders, that may have been given. If Ho written .instructions .were delivered to the master, which we are at-liberty to believe, as none-are produced, a better mode could hardly, have been devised to avoid detection. It has -been said in argument, that the intention of the master’s coming to the United States was-altogether contingent, and depended-on a repeal of the non-intercourse actj and that; he, accordingly, did not mean to come in if that act were still in force. But how does this appear ? Nothing of the kind is stated in his deposition ; on..the' -contrary, his coming in, according to his own account, depended not on the repeal of this law, but on the orders of his owner ; he came, he says, on this coast, with intention to obey, the orders of the consignee, not to attempt to conje into port unless he received orders from the owner, off Sagady Hook, so to do. If, therefore, he had found those laws yet in-force, which he probably had heard was the case, soon after his coming on the American coast, and long before he fell in with the pilot boat which carried down the letter of his owner, he still intended to have come in, if his owner had ordered him so to do. His intention, therefore, as taken from his own relation, is ' not altogether of that_ innocent nature which it has been represented to be. When the vessel sailed from Jamaica, does not exactly appear; all we know from the master’s .account is, that she . was there in August, and met with a gale on the 6th *68 of October following. It is probable, however, from these dates, that she had beeft long enough at sea to' meet with one or’raore vessel's from the United States, -from which iirformatioh' might- have1 been received of tne actual, state- of things in this country, in relation to this-law. Whréther'-ány • such vessel were met with, Wé know not; but .might have,known if any of the crew'ór of the passengers had been examined, or the'log-book produced. If such information were received'óri the coast, and the master of the Newr-York had persisted afterwards. in keeping the sea until he could hear-from his owner, it would amount to strong proof of an original design to come here.- The opinion which has already been intima-' ted on this part of the case, which depends on the intention with which the cargo was loaded, will be much strengthened by proceeding to consider the plea of necessity on which the coming in is justified,- and the facts relied on, in support of this plea. The nemust be urgent, and' proceed from such a 0f things as may be supposed to. produce on- ° J . 1 1 - - the mind of a skilful manner, a well grounded apprehension of the loss of vessel and cargo, or of the of the ere w. It is not every injury that may be rece-ve£j ;n a storm, as the splitting -of a sail, the . ° springing of a yard, or a.trifling leak, wdiich will ex- ^ B . .. J ’ , , ’ ,. , cuse the violation of the laws ot trade. Such accidents happen in every voyage ; and' the commere of co(lritry could be subject to any regulations, if they might be avodied by the setting up of such trivial accidents as these. It ought also to be Very apparent, that the injury, whatever it-may be, has not *69 been in any, degree produced, as was too often the case, during the restrictive system, by the agency' of the master,' and some Of the crew* Does' then the testimony in this case, carry with it that full conviction of the «i? major which ought to be made out. to avoid the effects of an illicit importation ? It will. not be right of proper for the court, in considering this part of th'e case, to devest- itself of those suspicions which weye so strongly excited in the first stage of this transaction ; for, if it were not very clearly made out that the lading of these goods on board was innocent, it will be some excuse for the incredulity which the court may discover respecting, the tale of subsequent distress. ' On ' this point, also, the claim. a nt is satisfied with the testimony of the master'.. Not a single mariner, not one of the passengers, although several were on board, is brought forward , in support of Bis relation. Of the wardens’ survey, notice will presently be taken. Now, admitting the master’s story tó be true, with those qualifications, however, which are inevitable, be has made out as weak, a case necessity as was ever offered'to a curot, in the many instances of this kind which occurred during the existence of the restrictive system. A gale of less than twenty hours continuance was all the bad weather that vfas encountered, in which it is said the rudder was carried away and the fofesail split ; the rudder may have been injured, but it could not have been ried away, if it be true, as from ...the master’s own account must have been the case, that the vessel after this-accident made at least one thousand miles in the course of the first five days, immediately after. *70 it is said that is no evidence as to the place where the accident happened. Of this fact the survey producced by the claimant- himself is conclusive. It ■ was taken from the mouth of the captain himself, and if he or the wardens committed á mistake in this' important particular, why was it not corrected by an exami©ation of the master, or a production of the log-book ? Nor has it escaped the attention, of the court, that if the New-Yórk were disabléd in lat- 27, 30 north, .long. 80 west, she'might have reached Amelia Island, her pretended port of destination; with much more ease, and in much less time than she employed in sailing more than ten'degrees to. the north, and taking hér station off Sandy Hook; for she was, oil the 6th df October, mu ;h nearer to that island, and the wind was'as fair as could, be desired to carry her there..
ofthe laws of trade, must be JSfeeed from tíüngt be supposed to produce on the mind a skilful marriner, a well wfOUtheeio/s of vesse^and^car-nQ Ives of the
*70 The plea of distress, therefore, is contradicted by a fact which could not have existed,, if itf had been as great as is now pretended ; nor can it be believed, if any great danger had been produced by the gale of the 6th of October, that either the crew of the passengers would have submitted, not only to come so many degrees to the north, but continue hovering on the coast until the owner could be heard from. No leak appears to have been the consequence < of the storm, no mast was lost, nor any part of the cargo thrown overboard; and if she steered and sailed as well as it seems she did, without a rudder, even a loss, so very essential and serious to other vessels, must be allowed to have worked little or no injury whatever, in this báse. To the subsequent surveys by the *71 wardens of the port, as far as they exhibit the condition of the. New Yorlc,- but little importance is to be attached. Ib appears to have been.an ex parte ceeding, and if all the injuries which they describe existed, as-they no doubt did, it is not. certain whether they were produced by the gale spoken of, or by any other accident ■ at sea, or by the act of the master himself; and, at any rate, their recommending repairs before she .hent to. sea again was very natural, the vessel being then in port ; but is no proof at all that she might not as well; and better, have gone, to Amelia Island, as to have come to that port. The letter to the master, which .has been produced, does not place in á very fair light .the pretensions of the claimant. However unpleasant the task, the court is constrained to máke some remarks on it. ■ It seems agreed that it is but little calculated to. lull the suspicions which other- parts of this case have excited. The interpretation resorted to by- the claimant is at variance with the only appropriate sense of the terms which are used, and' with the most manifest intentions of the writer. By changing the pott of departure, nothing else could have been intended than to legalize the voyage by the crew .swearing that the New-York had sailed-from some, West-India possession, not under the dominion of Great. Britain. This sense of the letter, which seems inevitable, is but little favourable to the. character of the claimant,., or to the integrity of thre transaction. Nor should it"be forgotten, that the master does not decide upon coming in until-this letter is received ; whereas, if his situation were as perilous as. he now represents it, he could not, and would not *72 have waited for orders. It is unnecessary to rely much on the two manifestsalthough one' of them, bearing on its face a .destination for New-York, is certainly much at variance with the pretended contingent destination of this vessel. The oath which the master made at the .custom-house,"that no goods' were on board-of the. New-York, the importation of which was prohibited by law, was not only false, but is an evidence of very great incaution on his part ^ for if 'the collector would administer the oath in no other form, it was no reason whatever for his attesting to a fact, the- falsity of which was apparent on the very manifest which was attached to. the oa'th.
The alleged opposition of the crew .to: wait for further orders, and their threats to come up in the. pilot-boat, have not been overlooked. This allegation depends altogether on the credit due. to the master, and is a circumstance not very probable in itself. No pilot, in the then, condition of the New-York, could have been so ignorant, and so regardless of his .duty, - as to take fyom her, without the master’s consent, any part, much less the whole, of her crew. If the. threat, therefore, were really made, the master ought not to hate been alariped at ft, and probably would’ have treated it with' contempt, if it had not been suggested by himself, or had not suited his then purpose; at any- rate, if by. remaining longer at sea than he . ought to have done, or by hovering on the coast in expectation of orders from his owners, after haying received so many injuries on the 6th of- October, and additional danger were produced, or well-grounded apprehensions and opposition on the part *73 of the crew, he would not without great reluctance on the part of the court, ue permitted to draw any very great advantage from a circumstance which his- own imprudence, if not his own fault, occasioned. The towing of the .New-York into port by a pilot boat, is supposed to be a circumstance which must nave proceeded from her disabled condition. This does not follow. It may have proóeeded' from- the - request of hér master; for it can hardly be believed that a vessel that had behaved so well after the gale of the 6th October, and which is not stated to have met- w^th any injury from subsequent causes, should, the moment it was necessary to take a pilot on board, be so ungovernable as to, require towing into port] If this were really the case, it is a matter of some surprise, that the claimant should not have recourse to the pilot himself to establish the-fact, and the reason of it.
Notwithstanding the untoward circumstances, which .have already been taken notice of, and the temptations which existed to commit violations of, the restrictive laws; which it is known were great, and'led to frequent' infractions of them, the court is. asked to acquit this property, without producing the letter of instructions to the master, or the orders, to the consignee in Jamaica, where it is alleged there was one, although hi$ name is not given, or. any, bill of lading, or invoice, or log-book, and in the face of two manifests, the one purporting a- destination contrary to law. To expect an[acquittal, in a case involved in so much mystery, it is not too much to say, that the uncommon circumstances attending it should have been explained *74 and accounted for in the most satisfactory maimer. But when for this explanation, the court is referred to the unsupported testimony of the master, who is-himself the particeps crimmis, if any offence have been com;, mitted, and who stands convicted on the papers before us, of a palpable deviation from truth, aud whose account, if true, would have induced .him and his crew to direct their course to Amelia Island, .instead of encountering a more northern latitude, we must believe that the mate and' others, who might- have proved the fact of distress, if real,, beyond all doubt, were not produced, not from mere negligence or inattention, but from a conviction that they would afford no sanction to the master’s relation.. It is now near eighteen months since the decree of the circuit court was pronounced, in which an intimation was given, that farther, testimony would be admitted here, and yet none has been produced.
■It is. the opinion, threefore, of a majority of the judges, that the. sentence of the court be affirmed, with costs.
Mr. Justice Johnson.
This is a. libel against the cargo of the ship New-York. The vessel herself was libelled for lading a cargo with intent to violate the laws of the United States; but thé cargó in this case is. libelled as forfeited, for having been imported into the city of .New-York contrary to law. The intent with which it was laden on board becomes immaterial as. to the cargo, except so far as it might operate t.o cast a shade of suspicion over, the act of coming into. port. The defence set up- is, that the. *75 Ship sailed with the alternative destination to go into New-York if legal, and if not, to bear away for Amelia Island. That she was ordered to call off the port of New-York for information; and in her voyage thither she encountered a storm, frpm which she sustained such damages as to oblige her to put into New-York for the safety'of the lives of the passengers and crew. That a vessel under such circumstances has a right to call off a port for information has been de_ cided in various cases; and it has, also, been decided, and is not now questioned, that if in the prosecution of that voyage, she sustains such damage as renders it unsafe to keep the sea, she might innocently enter the ports of the United States to repair, and resume her voyage. The laws of the United States make provision in such cases for securing the cargo to prevent an evasion ©four trade-laws.
There are, then, but two questions in the case: 1st Whether her actual state of distress was such as to make it unsafe for her to keep the seas? 2d. Whether that state of distress was the effect of design or accident? Admitting that the greatest frauds that can be imagined had been proven to have been in contemplation, yet as the libel does not' charge a lading with intent to import into the United States, it is immaterial to this decision to inquire what wás intended, if it be'made to appear that the distress, was real, and not pretended or fictitious. Now, as far as I can judge, the facts in this case are such as. leave nothing for the mind to' halt upon. The distress was obvious to the senses, and the nature of it such as could not have been produced by the ingenuity of man. Without dwelling *76 upon less important particulars, it appears, from the surveys, .that the fore-topsail yards were'sprung; the main cap split and settled; and the rudder carried away; or,-in the words of the survey, gone; and the stern-post,'after sheathing, and' cbunterplank much chafed. These words carried, away and gone, mean, in nautical language, wholly, disabled or -.rendered useless. And that such was the state óf the rudder is evident from the contents of the surveys. For, when the vessel was Time keel out, ii appeared that the middle rudder brace was broken; and' the crown of the lower brace gone; so that it is evident the rudder must have swung in the chains. And that this was the case appears from several particulars, also gethered from the surveys: 1st.. The impossibility, on -any other supposition; to believe, that the surveyors would on the first survey, before the .vessel was - hove-downy report the rudder gone. 2d. The chafed state of the rudder and-stern post, could only have been ■ produced by the action of. the rudder against the stern-post, when forced to and fro by the waves, and must, have occurred at sea. And, lastly, the same cause naturally produced the injury reported to have been done to her counter-plank and after sheathing. These injuries, I repeat, could not have been done by the hand of man, especially those' áustained under water; and although I see neither fraud nor falsehood in the case, yet I care not though every word of the testimony, besides, be-false: “that falsehood could neither have produced these injuries, nor repaired them;'and the evidence is sufficient to show.that the safety of *77 ■ the lives of the passengers and crew required, the vessel to put into port, dnd- therefore it was innocent.
In this opinión I' am supported by two of my brethren, the Chiéj? Justice, and Mr. Justice' W ash i n,c-TON„
Decree affirmed.