NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0102n.06
Filed: February 10, 2005

No. 03-4176

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SAMUEL BOLANDER, | ) | |
| | ) | |
| *Plaintiff-Appellant,* | ) | |
| | ) | |
| v. | ) | **On Appeal from the United** |
| | ) | **States District Court for the Northern** |
| BP OIL COMPANY, et al., | ) | **District of Ohio, Western Division** |
| | ) | |
| *Defendants-Appellees.* | ) | |

**Before:** **BOGGS, Chief Judge; GUY, Circuit Judge; and STEEH, District Judge[1]**

**PER CURIAM.** Plaintiff Samuel Bolander appeals from the district court's grant of summary judgment in favor of defendants BP Oil Company, et al. Bolander's complaint alleged claims of age discrimination, retaliation and intentional infliction of emotional distress. Because we hold that Bolander failed to state a prima facie case of discrimination, failed to produce evidence to support an inference of retaliation, and failed to show extreme and outrageous conduct by defendants to support his tort claim, we affirm.

**I.**

---

[1]The Honorable George Caram Steeh, United States District Court for the Eastern District of Michigan, sitting by designation.

Samuel Bolander started working at the Toledo refinery operated by BP Oil Company ("BP") and its predecessor on August 28, 1973. Bolander became a supervisor in the maintenance department in 1976. Bolander worked his way up to various management and leadership roles in the maintenance department from 1976 until his discharge in 2002. At the time of his termination, Bolander was 51 years old.

In 1998, BP merged with Amoco. In November, 1999, Jeanne Johns became the Business Unit Leader ("BUL") and Ken Panozzo became the maintenance department manager. Shortly thereafter, the personnel grading system was converted from BP grades to Amoco levels. Panozzo explained that Bolander's pay grade was reduced because the pay grade established for his position was not consistent with comparable maintenance supervisory positions. This change in pay grade did not result in a change of salary or job duties, but Bolander considered it a demotion. In March, 2000, Bolander's pay grade was reduced again following a substandard performance appraisal performed by Panozzo. This second pay grade reduction also did not result in a decrease in salary.

In the year 2000, most of the management positions were placed for bid in a process known as "T2K+". All affected jobs were declared open and employees were invited to bid on them. Jobs were available for bid in four different waves. In the second wave of the T2K+ process, Bolander bid on an "Asset Coordinator" position. His bid was not successful; thereafter Panozzo and Alan Clink encouraged him to bid in the next wave on a maintenance supervisor position. Bolander initially refused this invitation, considering it to be a demotion, but he ultimately bid on the position and received an offer in September, 2000. There was no reduction in Bolander's salary, which remained consistent until his termination.

In August, 2000, in the course of evaluating Bolander for the T2K+ job bid, it was discovered that Bolander failed to follow safety procedures on two occasions. Panozzo asked Clink to investigate. Clink spoke to employees involved in the incidents, and to Bolander. During the investigation, Clink learned of a third safety incident that occurred in May, 2000. After concluding his investigation, Clink reviewed the information he obtained with Panozzo and Human Resources Specialist Marcene Jackson.

On October 4, 2000, Bolander received a disciplinary action which alleged that he had been guilty of three safety infractions in the past. The letter indicated that further safety violations would result in additional disciplinary consequences, up to and including termination.

In December 2000, Bolander filed a charge of age discrimination with the Ohio Civil Rights Commission ("OCRC"). The charge challenged the denial of the Asset Coordinator job bid that had occurred the previous summer during the second wave of the T2K+ process. The charge alleged Bolander did not receive the job because of his age. The OCRC investigated, and ultimately dismissed Bolander's charge. The OCRC noted that Bolander's 1999 performance appraisal was "less favorable" than those of the successful candidates, and that "four of the seven successful candidates [for the asset coordinator positions] were members of [the] protected group." Bolander requested reconsideration of this finding, and on November 29, 2001, the OCRC upheld its original decision.

In November, 2001, Pat Gower replaced Jeanne Johns as BUL. Gower is two years younger than Bolander. Bolander does not believe Gower ever made any derogatory remarks to plaintiff about his age. Significantly, Gower considered job safety to be one of his highest priorities as BUL.

On April 1, 2002, without a "hole watch" (fellow worker observing him), Bolander placed his head and one shoulder across the plane of a confined space to observe whether the vessel had been cleaned. This action violated safety rules and was observed by three employees of an on-site contractor (the "Washington Group"). One of the three individuals was Corie Spurgeon, the Safety Specialist for the Washington Group. According to Spurgeon, Bolander was inside the confined space for about two minutes without a hole watch present.

An investigation took place over the next several days. Human Resources Specialist Jackson, Panozzo, and another supervisor interviewed several people, including Spurgeon and Bolander. After the investigation concluded, Jackson informed the refinery's Human Resources Manager, Bill Christensen, of the results. Christensen informed Gower of the status of the matter. Gower discussed the matter with several senior managers, including Panozzo and Clink, and concluded that Bolander should be terminated. Gower instructed Christensen and Panozzo to meet with Bolander to advise him of his termination. Panozzo had several "talking points" prepared to explain to Bolander that he was being terminated for safety violations.

In support of his motion for summary judgment, Bolander submitted testimony from several employees to the effect that it was common practice, for various reasons, to cross the plane of a confined space without a hole watch present. Robert Sauer, a refinery safety adviser employed by plaintiff for 25 years, testified that prior to Bolander's termination, it was an accepted and common practice at the refinery to look inside permitted confined spaces without an attendant present. Thomas Moroni worked at the refinery from November 1990 until July 2000. He testified it was normal practice for managers to break a fully permitted confined space without a hole watch present. He stated that he did it himself as recently as 1999. Jonathan Parker was an employee in the Health,

Safety and Environmental Department at the refinery from November 1988 until March 1998. He testified that the revised confined space entry procedure did not prohibit qualified persons such as supervisors from briefly breaking the plane of the permitted confined space, without a hole watch present, to make a brief visual inspection.

As evidence of age-based animus, Robert Sauer testified that Alan Clink and Ken Panozzo repeatedly referred to certain people as the "old guard" beginning shortly after Panozzo, Pat Ward, and Johns were named to the reconstituted senior team. The term was targeted at influential employees who had been there for 20-plus years. Also, Panozzo often talked about seeking "young, energetic engineers" for positions. On at least one occasion, Panozzo made such a comment with regard to the position of "Asset Coordinator." Thomas Moroni testified by affidavit that from time to time Panozzo would consult with him concerning various personnel issues in the maintenance department. On several occasions Panozzo referred to Bolander as being part of the "old guard." On several occasions Panozzo told Moroni that there was a "younger and more dynamic way of doing things" at the Toledo refinery. Panozzo also told Moroni that he liked some of the younger engineers at the Toledo refinery because they were "younger and energetic."

After Bolander's termination, David Murray temporarily assumed his position. Murray was 59 years old. On May 2, 2002, Dan Waterfield was selected to fill the position on a permanent basis. Waterfield was 49 years old. Waterfield still holds the position.

## II.

We review the district court's grant of summary judgment de novo. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).

-5-

Age discrimination cases under the ADEA are analyzed under the same framework as employment discrimination cases under Title VII. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). Bolander's claim in this case arises under the Ohio age discrimination statute, which parallels the ADEA analysis. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998). In the absence of direct evidence of age-based animus, a plaintiff establishes a prima facie case of age discrimination by showing (1) he is a member of the protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was replaced by a person outside the protected class. *Id.* "In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." *Id.* (citing *Kline v. TVA*, 128 F.3d 337, 342 (6th Cir. 1997)).

Our recent decision in *Grosjean* involved age discrimination claims under federal and Ohio law. The Sixth Circuit upheld summary judgment on the grounds that the plaintiff failed to establish a "prima facie case of age discrimination because he was not replaced by a person significantly younger than himself." *Grosjean*, 349 F.3d at 334. "[T]he prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). This "inference cannot be drawn from the replacement of one worker with another worker insignificantly younger." *Id.* at 313. In *Grosjean*, we conducted a review of precedent from other circuits, and concluded that replacement by an employee who is within six years of the plaintiff's age would be insufficient to establish a prima facie case of age discrimination.

> Given this array of authority, and our circuit's precedent, we hold that, in the absence of direct evidence that the employer considered age to be significant, an age

difference of six years or less between an employee and a replacement is not significant.

*Grosjean*, 349 F.3d at 339. Bolander was initially replaced by an employee 8 years his senior, and ultimately by an employee 2 years his junior. Therefore, plaintiff cannot make out a *prima facie* case under *McDonnell Douglas*.

Bolander urges the court to modify the holding in *Grosjean* to reflect that under unusual circumstances, replacement by an insignificantly younger worker, or even an older worker, is not inconsistent with age-based motivation. For the reasons articulated in that case, we decline to do so. *Id*. at 337-40. *Grosjean* provides, however, that direct evidence may still be used to prove a case of discrimination even in the absence of replacement by a substantially younger worker. *Id*. at 340.

"Direct evidence" of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action." *Jacklyn v. Schering-Plough Health Care Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Allegedly discriminatory remarks made by somebody other than the decisionmaker, or statements that are "unrelated to the decisional process" at issue, do not constitute "direct evidence." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998).

Bolander does not produce any evidence that Pat Gower considered age to be a significant factor in making the determination to terminate. Rather, Bolander presents evidence that Clink and Panozzo made ageist comments and were involved in the decisionmaking process. Panozzo allegedly made the remark that he was looking for "young energetic engineers" in connection with the filling of the Asset Coordinator position in the summer of 2000, almost two years before Bolander's discharge. This comment lacks sufficient connection to the discrimination alleged by

Bolander to be considered direct evidence. *Id.* The "old guard" references were targeted at long-term employees who were resistant to changes being implemented by BUL Johns in 2000 and 2001. There is no evidence the term was used in connection with Bolander's discharge or that other members of this group were terminated.

Bolander also submitted statistical evidence to support his claim of age discrimination. A statistical analysis of demotions and salary of Toledo refinery employees by age was conducted by Dr. Malcolm S. Cohen, Ph.D. Dr. Cohen compared employees under age 40 to those age 40 and over with regard to demotions in 2000 and salary increases for years 2000 and 2001. The report shows that in the year 2000, 25 of 129 employees over 40 were demoted as compared to none of the 36 employees under age 40. Dr. Cohen found there are only 3 chances out of 1000 that all 25 of the demotions would be among persons over age 40.

Personnel changes that occurred in 2000 would have been under the previous BUL, Jeanne Johns, and not Pat Gower. There is sufficient evidence to conclude that these statistics reflect the T2K+ process in which most management positions became open to a bidding process in 2000. A reasonable explanation for why the younger employees were not demoted is that they were largely limited to lower level positions. Moreover, the evidence concerns the bid process of 2000, not the termination decision in 2002. For these reasons, the affidavit from the statistician is not direct evidence of discrimination against plaintiff in 2002.

Bolander also relies on the affidavit of Earl Gilbert and the deposition of James Thomas, both of whom were plaintiff's co-workers. They each testify to the effect that younger people received promotions during the T2K+ bidding process in 2000. To consider this testimony relevant to Bolander's termination in 2002, however, one must make multiple inferences and, therefore, the

evidence cannot be considered direct. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). As with the statistical evidence, this testimony bears only a strained relationship to Bolander's termination if at all. It deals with employment decisions of a different caliber made by a different supervisor two years before plaintiff was terminated.

Bolander lacks direct evidence of discrimination and therefore must resort to the *McDonnell Douglas* approach to state a *prima facie* case of discrimination. Bolander has not shown that he was replaced by a significantly younger worker where his replacement was only two years younger. Therefore, Bolander's attempt to show age-discrimination under *McDonnell Douglas* fails.

### III.

Bolander argued before the district court that he was entitled to have the evidence analyzed under the mixed-motive burden-shifting method articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and modified by *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). If *Desert Palace* applies to age discrimination cases, a plaintiff could state a *prima facie* case by using circumstantial evidence to show that he was terminated *at least in part* due to his *age*. *See* 539 U.S. at 101. In this case, however, there is not enough evidence, direct or indirect, that age was "a motivating factor" for Bolander's termination. *Ibid*. (quoting 42 U.S.C. § 2000e-2(m)).

First, there is strong evidence that safety was of paramount importance, especially after Pat Gower took over as BUL in November, 2001. BP's policy requiring use of the buddy system was an important part of the confined space safety policy, of which Bolander was aware. Bolander's alleged violation of the confined space policy was witnessed by a group of independent contractors, who raised the violation to their safety director, who also witnessed the violation. During BP's

investigation, Bolander admitted to committing the violation. Finally, Bolander received a safety violation warning in the past, and was on notice of how BP would respond to any future violations.

As is more fully articulated in the proceeding section, there is little evidence that age played a role in the decision to terminate Bolander. Panozzo's alleged ageist comments had no connection to Bolander's termination. Gower was approximately the same age as Bolander and he is not accused of making any ageist remarks or having any age-based animus toward Bolander. Plaintiff's statistics, affidavit, and deposition evidence concern another set of employment decisions made by a different supervisor two years before plaintiff was terminated. The same can be said about plaintiff's third-party affidavit and deposition testimony. There is no evidence to create an issue of fact whether age was a motivating factor in BP's decision to terminate Bolander. This is not a mixed-motives case; therefore the applicability of *Desert Palace* is not an issue and we do not reach it.

**IV.**

Bolander's fourth assignment of error deals with the district court's dismissal of his retaliation claim. Bolander filed a charge of discrimination with the Ohio Civil Rights Commission in December 2000. The charge was dismissed 12 months later, with the OCRC finding no probable cause to believe there was any discrimination based on age. Bolander alleges in his complaint he was discharged in April 2002 in retaliation for the filing of the OCRC charge in 2000.

A prima facie case for retaliation requires a showing that: (1) the plaintiff engaged in activity protected by Title VII or the state civil rights act; (2) the exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and

(4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

It is the fourth element, requiring a causal connection between Bolander's filing of the OCRC charge and his discharge, that is at issue in this appeal. Seventeen months passed between the two events in this case, and the district court held that a "seventeen month hiatus between the filing of the charge and plaintiff's firing is to[o] long to raise an inference of retaliatory animus." The district court cited to this court's case of *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four-month interval insufficient to support inference of retaliatory motive).

In order to prove his claim, Bolander was required to produce some additional evidence to demonstrate a causal connection between the protected activity and adverse employment action. Bolander argues that he was unfairly singled out for the safety violation, when the alleged safety violation was conduct routinely taken by other similarly situated persons, and was arguably not a safety violation at all. BP points out that the April 1 safety violation was brought to its attention by the safety manager of another company. In addition, Bolander had already received a written warning for placing his judgment above the requirements of safety policies, a warning that preceded the filing of the OCRC charge.

The passage of 17 months between the filing of the OCRC charge and Bolander's termination does not allow any inference of causal connection, and Bolander has produced no evidence of any connection between the protected activity and the termination of employment. The district court did not err in granting summary judgment to BP Oil on Bolander's retaliation claim.

**V.**

-11-

Bolander contends that the district court improperly dismissed his intentional infliction of emotional distress claim. Under Ohio law, a plaintiff must demonstrate that: (1) the defendant intended to cause emotional distress, or knew or should have known that his conduct would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was outrageous and extreme beyond all bounds of decency and subsequently can be characterized as utterly intolerable in a civilized community; (3) the defendant's conduct was the proximate cause of plaintiff's psychic injuries; and (4) the plaintiff's emotional distress was serious, and of such a nature that no reasonable person could be expected to endure it. *Ekunsumi v. Cincinnati Restoration, Inc.*, 120 Ohio App. 3d 557, 561 (Ohio Ct. App. 1997); *see generally Yaeger v. Local Union 20*, 6 Ohio St. 3d 369, 375 (1983). "To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Baab v. AMR Services Corp.*, 811 F.Supp. 1246, 1269 (N.D. Ohio 1993).

This court has held that "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more. If such were not true, then every discrimination claim would simultaneously be a cause of action for intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999). In this case there is no evidence of outrageous conduct on the part of defendant. The district court properly dismissed this claim. For these reasons, we AFFIRM the judgment of the district court.