**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0174n.06

**No. 10-6228**

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS** | | |
| **FOR THE SIXTH CIRCUIT** | | |

**FILED**

**Feb 13, 2012**

LEONARD GREEN, Clerk

DOLLIE AYERS-JENNINGS,                              )
                                                   )
          Plaintiff-Appellant,                     )     ON APPEAL FROM THE
                                                   )     UNITED STATES DISTRICT
v.                                                 )     COURT FOR THE
                                                   )     WESTERN DISTRICT OF
                                                   )     TENNESSEE
FRED'S INC.,                                       )
                                                   )        O P I N I O N
          Defendant-Appellee.                      )

---

**BEFORE:**    McKEAGUE and WHITE, Circuit Judges; and BARRETT, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Dollie Ayers, an African-American woman, worked for Fred's, Inc. for some 28 years. In 2006, she began dating Willie Jennings, an area manager in the Memphis warehouse where she worked. Jennings was not her direct supervisor, but there could be times when she might be subject to his supervision. Ayers and Jennings were married in July 2007. When they returned to work from their honeymoon, they were informed that one of them would have to resign because company policy prohibited any employee from working directly or indirectly under his or her spouse. Because her compensation was significantly less than her husband's, Dollie Ayers-Jennings reluctantly resigned and brought suit under Title VII, alleging her termination,

---

[*]Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

pursuant to a policy that was not strictly enforced as to others, was motivated by race discrimination.

Plaintiff attempted to establish a prima facie case of race discrimination by showing that similarly situated employees were treated more favorably. She offered evidence of three white employee-couples, all of whom were allowed to keep working at Fred's after marriage. Fred's moved for summary judgment, contending the comparators were not similarly situated in all relevant respects. The district court agreed. The court held the evidence plaintiff relied on did not support an inference of race discrimination. Plaintiff was found not to have made out a prima facie case and Fred's motion for summary judgment was granted.

Although plaintiff's termination was abrupt and resulted in unfortunate hardship, the record evidence could not warrant a reasonable jury finding that race discrimination motivated her termination. We therefore affirm the district court's summary judgment ruling.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dollie Ayers began working at Fred's in 1979. Fred's is a retail chain with its headquarters in Memphis, Tennessee, and stores across the southeastern United States. In 2006, Ayers began dating her future husband, Willie Jennings. Jennings was one of approximately ten area managers in the Distribution Center, a Fred's warehouse in Memphis. Ayers was a strategy control clerk; that is, a clerk who redirected misdirected merchandise within the same warehouse. Jennings was not Ayers's direct supervisor, but under the organizational structure in the warehouse, divided into at least four areas, it appears any warehouse employee could fall under the supervision of any area manager, depending on the circumstances.

Prior to their wedding, both Jennings and Ayers mentioned their wedding plans to their supervisors, none of whom cautioned them about the impact of their marriage on their employment status. On July 30, 2007, when Willie Jennings and the now Dollie Ayers-Jennings returned from their honeymoon, Senior Vice President Reggie Jacobs called them into his office. Jacobs had not been aware of their relationship and just learned of the newlyweds' wedding the day they returned from their honeymoon. He made the determination that this was a potential problem. Jacobs told them that their marriage brought them into violation of the company's non-fraternization policy and that one of them would have to resign. There was no discussion at that time; Jacobs simply gave them twenty-four hours to talk it over and decide.[1]

The non-fraternization policy referred to restricts relationships between co-employees where one would be in a position to supervise the other. The policy includes the following pertinent provisions:

> Single management employees are not to date anyone they may directly or indirectly supervise.

> Because of the possible distractions at work, single employees are discouraged, but not prohibited, from dating other single Fred's, Inc. employees.

> Close relatives, from immediate family through first cousins, are not to be assigned to the same department, nor are management employees to supervise close relatives. Exceptions may be approved by the President.

---

[1] Jacobs was the Senior Vice-President of Distribution and Transportation, overseeing all warehouse operations. He was known to be "a stickler for company policy." In Jacobs' own words: "As both a Senior Vice President and as an Executive Vice President I take my responsibilities seriously and strictly enforce Fred's rules and policies to maintain continuity and order for the employees and supervisors under my management and control." R. 24, ex. A, Jacobs aff. at ¶ 4.

- 3 -

R. 24, ex. D, Non-Fraternization Policy, No. 600.11. Also relevant is the policy concerning

employment of relatives and friends of current employees, which provides in pertinent part:

> (4) No relative shall work in the same department except as approved in advance by the Vice President of Personnel.
>
> (5) One relative is not placed under the supervision of another.
>
> . . . .
>
> (7) Should any two employees marry each other after working for the Company while single, there is no requirement under this policy that one of them resign. However, Items #4 and #5 would be in effect.

R. 25, ex. I, Employment of Relatives/Friends of Employees Policy, No. 100.13.

Ayers-Jennings does not contend that she was unaware of these policies. In fact, she had

signed a form on April 28, 2005, acknowledging that she had read and understood the

Standards/Conduct Policy, which included notice that "management personnel dating individuals

whom they supervise" is conduct that could "result in disciplinary action up to and including

termination." R. 24, ex E. Jennings later explained that he "had never been Dollie's direct

supervisor" and he "thought that they would just move one of us when we got married." R. 25, ex.

C, Jennings aff. at ¶¶ 14, 16.

Fred's made inquiry into the possibility of transferring Ayers-Jennings to a different position

where she would not be subject to the possibility of supervision by her husband. However, because

all employees in the Memphis warehouse were potentially subject to supervision by all area

managers, this meant that Ayers-Jennings would have to be qualified for an entry-level position in

the "corporate division." Inquiry was undertaken by Jamie Naughton, Senior Vice-President of

Human Resources, but no position for which Ayers-Jennings was deemed qualified was available, i.e., in the mail room or as a receptionist or accounts-payable filing clerk.[2] Faced with no good choice, the couple reluctantly decided that Ayers-Jennings would resign, because Jennings had the far greater income. She was discharged on July 31, 2007.

Feeling that she was unfairly forced to resign, plaintiff Ayers-Jennings commenced this action in the Western District of Tennessee in September 2009, asserting race discrimination claims under Title VII, 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 *et seq*. On completion of discovery, Fred's moved for summary judgment, contending that plaintiff had failed to establish a prima facie case of race discrimination and, in the alternative, that she had failed to establish that Fred's facially legitimate reason for discharging her was pretextual. The district court granted the motion on September 21, 2010, finding that plaintiff had failed to establish a prima facie case of discrimination. Plaintiff timely appealed.

## II. ANALYSIS

### A. Standard of Review

An order granting summary judgment is reviewed de novo. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

---

[2]The prospect of transferring Jennings to Fred's second warehouse building in Memphis was not considered because it would not have "fixed the problem," since warehouse managers moved freely between the neighboring buildings in Memphis. R. 24, ex. B, Jacobs dep. at 31-32; R. 25, ex. B, Jacobs dep. at 63. The possibility of transferring Jennings to Fred's warehouse facility in Dublin, Georgia was not explored, nor is there any suggestion that the couple requested such consideration or that there was an opening in that facility.

as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *White*, 533 F.3d at 390. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Id.* A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id.* at 298-99.

### B. *McDonnell Douglas* Framework

The parties and the district court have treated all three of plaintiff's race discrimination claims as being governed by the same legal standards, exemplified by the case law applicable to the Title VII claim. The parties also agree that there is no direct evidence of race discrimination and that plaintiff's circumstantial evidence must be evaluated under the burden-shifting framework prescribed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination under Title VII, plaintiff must show that (1) she was a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated "nonprotected" employees. *Id.* at 802; *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). If plaintiff makes this showing, the burden shifts to Fred's to articulate a legitimate, nondiscriminatory reason for having terminated plaintiff. *McDonnell Douglas*, 411 U.S. at 802-03. If Fred's meets this requirement, the

final burden of persuasion rests with plaintiff to show that the proffered reason is actually a pretext for unlawful discrimination. Plaintiff can carry this burden by showing that the stated reason for termination "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White*, 533 F.3d at 393.

In applying this framework in the context of a motion for summary judgment, the question at each stage of the analysis is whether the party with the burden of production has presented sufficient evidence to create a genuine issue of material fact. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811-12 (6th Cir. 2011). Plaintiff retains the burden of persuasion that she was the victim of race discrimination. *Id.* at 812.

## C. Prima Facie Case

The district court concluded that plaintiff failed to meet the fourth element of her prima facie case. That is, plaintiff failed to show that nonprotected, similarly situated employees were treated more favorably than she was.[3] Specifically, the district court held that the three comparable employee-couples relied on by plaintiff were not similarly situated in all relevant respects.

---

[3]There is no dispute that plaintiff is a member of a protected group, satisfying the first element. For purposes of the motion for summary judgment, Fred's conceded that plaintiff's resignation represented a cognizable adverse employment action, satisfying the second element. As to the third element, Fred's argued below that although plaintiff had undisputably been a good employee for a long time, she had ceased to be qualified for her position when she married Jennings, who could potentially be her supervisor, giving rise to a violation of the non-fraternization policy. The district court held that a reasonable jury could conclude that the wedding did not render Ayers-Jennings unqualified for her position, but only brought Jennings, as a manager, into violation of the policy. R. 31, District Court Order at 8-9. Fred's has not challenged this determination on appeal. Hence, the only issue presented on appeal concerns the fourth element and whether plaintiff presented sufficient evidence that she was treated differently than other employees not in her protected group.

To support an inference of unlawful discrimination, comparable non-minority employees who received more favorable treatment than plaintiff must be shown to be similarly situated in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998). Plaintiff need not demonstrate an exact correlation with the asserted comparable employees receiving more favorable treatment in order for them to be considered "similarly situated." *Id.* In *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992), the court held that "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." In *Ercegovich*, the court acknowledged that the factors considered in *Mitchell* are generally relevant, but explained that an independent determination of relevant aspects of employment status must be considered in each case. 154 F.3d at 352. The factors considered in *Mitchell* "are only apposite where they are meaningful to the particular claim of discrimination presented." *Bobo v. United Parcel Serv., Inc.*, — F.3d —, No. 09-6348, 2012 WL 34264 at *8 (6th Cir., Jan 9, 2012).

### 1. *Jay & Angel Easterling*

Jay and Angel Easterling are the most similarly situated comparable employees. Jay and Angel—who are both white—worked in the imports department of Fred's corporate division, where Angel was Jay's direct supervisor—before they were married. It is undisputed that employees in both the corporate division and the warehouse division were subject to the same non-fraternization policy. In 2005, before they were married, Jay advised Alan Crockett, Vice President of Finance,

that he and Angel wanted to begin a relationship. Crockett then approached Jamie Naughton, Senior Vice President of Human Resources, to seek approval of Jay's transfer to the inventory department, where he would not be subject to Angel's supervision. Naughton confirmed that Jay was qualified for the transfer and approved it so that Angel would no longer be his direct supervisor. This was accomplished before Jay and Angel were married.

Plaintiff contends the Easterlings received more favorable treatment though they were similarly situated in all relevant respects: they were both employed by Fred's; they became romantically involved and got married; and Fred's allowed both of them to continue their employment despite their marriage, as Naughton approved Jay's transfer to a department where he would not be supervised by Angel. Fred's contends the Easterlings' situation is materially distinguishable in that: Jay was never in a position where he was subject to Angel's supervision after they got married; and Naughton approved Jay's transfer to an available position outside of Angel's supervision for which he was qualified.

Plaintiff does not argue that Jay was unqualified for the position to which he was transferred. Nor does she argue that there was any available position in the corporate division for which she was qualified. Neither does she contend that she or Jennings, like Jay Easterling, ever requested a transfer or other accommodation before or after their marriage. Nonetheless, plaintiff contends the Easterlings were sufficiently similarly situated to support an inference of race discrimination.

Fred's contends that plaintiff ignores critical differences, arguing that, unlike plaintiff: none of plaintiff's comparators were warehouse workers (where, under Fred's organizational structure, every laborer is subject to supervision, direct or indirect, by any manager); none of plaintiff's

comparators were subject to supervision by Reggie Jacobs (the "stickler for company policy" who enforced the non-fraternization policy in plaintiff's case); and none of the comparators presented a situation where one spouse was in a position to manage the other.

In response to the first and third of these points, plaintiff contends that the *possibility* that her husband could be in a position to supervise her in the warehouse after their marriage should not be deemed significant, insisting there is no evidence that he ever directly supervised her before their marriage. Yet, plaintiff has not offered any evidence refuting Reggie Jacobs' explanation of Fred's organizational structure:

> There are two separate and distinct divisions within Fred's: one is the corporate division which is divided into professional work groups. Employees are hired into a specific work group based on their professional work experience and educational level including university level areas of study. The other division is the warehouse division which is a labor based workforce and Fred's cross-trains employees and managers to be able to work in all areas of the warehouse if the need arises. The corporate division does not cross-train the professionals to work in other groups because of the specialized nature of the work-group sub-divisions in the corporate division.

> Warehouse managers and employees receive cross-training in all warehouse areas so each area can be properly staffed and managers can cover all areas when necessary.

> The warehouse division handles nearly all of the products stocked at Fred's retail stores and it is essential that employees be able to work in all areas of the warehouse when a need arises. Likewise, warehouse managers must be able to manage in all warehouse areas when a need arises. Because of this structure, it is highly likely that each employee will come under the supervision of each of the managers at some time.

> Because the corporate division and the warehouse division are separate and distinct divisions, warehouse supervisors do not have managerial control over an employee in the corporate division.

- 10 -

R. 24, ex. A, Jacobs aff. at ¶¶ 5-8.

Considering this undisputed organizational structure, plaintiff's argument that the possibility of her coming under the supervision of her husband was insignificant amounts to nothing more than a challenge to Fred's business judgment. Such a challenge is relevant only if the circumstances give rise to an inference of unlawful discriminatory motive. *See Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009) ("[W]e look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's 'motivation and intent' to determine whether the employer was motivated by [discrimination]." (quoting *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987))). Here, however, there is no hint that Fred's decision to enforce its non-fraternization policy after plaintiff and Jennings were married was motivated by race discrimination. There is no evidence that Fred's had ever allowed married employee-couples, of any race or color, to continue employment in the warehouse or corporate division under circumstances where one was subject to the possibility of supervision by the other.

As to the second point, above, plaintiff does not dispute the contention that none of her comparators were subject to supervision by Reggie Jacobs, but she contends that Jamie Naughton played a role in both the discontinuation of her employment and the continuation of Jay Easterling's employment. Whereas Naughton approved Jay's transfer to another department to save his employment, Naughton did not approve plaintiff's transfer, resulting in her termination. However, even if Naughton is accepted as having played a decisive role in both situations, plaintiff does not dispute that, on the one hand, Jay was qualified for an available position in a department where he would not be supervised by his wife; and on the other hand, there was no available position within

plaintiff's qualifications to which she could be transferred to avoid supervision by her husband.

Again, the record simply does not support an inference that Naughton's facially different treatment

of the two situations was motivated by race discrimination.[4]

Accordingly, the district court did not err in determining that the Easterlings were not

similarly situated in all relevant respects.

### 2. *Ralph & Lenora Hickman*

The second asserted comparable employee-couple are Ralph and Lenora Hickman, who were

both employed by Fred's for some twelve years after they were married. Lenora has been employed

by Fred's for some 34 years. She has held various management-level positions in the Distribution

Center warehouse. Her former husband Ralph (they were divorced three years ago) has worked for

Fred's, exclusively in the corporate division, for 17 years. Plaintiff does not contest Fred's assertion

that neither Lenora nor Ralph ever worked under the supervision of the other spouse. Instead, she

argues ineffectually that both of them worked for a period of seven years during which Jamie

Naughton occupied the position of Senior Vice President for Human Resources and never raised any

---

[4]The record is ambiguous in relation to whether Jay and Angel were permitted to begin their relationship at a time when they worked in the same department of the corporate division *before* he was transferred. But even if the answer to this question were deemed to be yes, this would not show that Jay and Angel received more favorable treatment than plaintiff and Jennings. Plaintiff and Jennings, too, were permitted to work together in the warehouse while they were in a relationship for some nine months. *See* R. 25, ex. B, Jacobs dep. at 57, 71 (explaining that he (Jacobs) was unaware of plaintiff's and Jennings' relationship before they were married and that he did not "make it a point to inquire on a regular basis of the dating practices or relationships of the employees in the DC."). It was thus plaintiff's marriage to Jennings while still under his indirect supervision that precipitated the adverse treatment she received. *Id.* at 48. Jay, on the other hand, had been transferred away from Angel's department some time before they married. Hence, again, the fact that Jay and Angel *may* have started a relationship before he was transferred does not support an inference of race discrimination.

concern about their marriage. Plaintiff has made no showing that either Lenora or Ralph or their marriage ever violated the non-fraternization policy.

In fact, Lenora once applied for a position in the merchandising department where her husband worked (in the corporate division). She was told she was not eligible for the position because her husband worked there and she could be subject to supervision by her husband if she were awarded the position. In other words, the Hickmans were not treated any more favorably under the non-fraternization policy than were plaintiff and her husband. The Hickmans have not been shown to be similarly situated in any way that would support an inference that plaintiff's termination was motivated by race discrimination.

### 3. *Reggie & Leigh Ann Jacobs*

The third comparable employee-couple is Reggie and Leigh Ann Jacobs. They are similarly situated to the Hickmans. That is, they, too, are long-term married employees of Fred's, one of whom has worked in the warehouse (Reggie) and one of whom has worked in the corporate division (Leigh Ann). Neither was ever in a position to supervise the other. There is no evidence that they ever ran afoul of the non-fraternization policy. They offer little support for plaintiff's claim.

Accordingly, it is apparent that the district court did not err in holding that plaintiff had not satisfied the fourth required element of her prima facie case. Plaintiff's evidence that comparable white employee-couples received more favorable treatment from Fred's than she and her husband has little probative value because none of the comparators are similarly situated in all relevant respects. Because of the patent and material dissimilarities between plaintiff's situation and those of her comparators, the fact that Fred's allowed each of the comparable employee-couples to

- 13 -

continue their employment after they were married simply does not give rise to a reasonable inference that the less favorable treatment received by plaintiff was motivated by race discrimination. Plaintiff has thus failed to show error in the district court's ruling that she failed to meet the requirements of her prima facie case..

## III. CONCLUSION

No reasonable person would disagree that plaintiff deserved better. A good, loyal employee of some 28 years was given 24 hours to decide whether she or her husband would resign—not because of "misconduct" of any kind—but because of a blessed event: their matrimonial union. A cruel irony indeed. Yet, though we fail to understand such inflexible adherence to company policy, the civil rights laws do not give the courts license to micromanage the workplace in the absence of evidence of unlawful discrimination. "A reason is legitimate for purposes of the civil rights laws if it is nondiscriminatory, even if it is mean-spirited, ill-considered, inconsistent with humane personnel policies, or otherwise objectionable." *Galbraith v. N. Telecom, Inc.*, 944 F.2d 275, 282 (6th Cir. 1991), *overruled on other grounds*, *Kline v. Tenn. Valley Auth.*, 128 F.3d 337 (6th Cir. 1997). Because plaintiff was unable to establish her prima facie case under the *McDonnell Douglas* framework, the district court's award of summary judgment to Fred's was not improper and the judgment is hereby **AFFIRMED**.