[Cite as *Smith v. Superior Prod., L.L.C.*, 2014-Ohio-1961.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Don O. Smith,                                    :

      Plaintiff-Appellant,              :

v.                                               :            No. 13AP-690
                                                          (C.P.C. No. 11CVH-15815)

Superior Production, LLC,                         :
                                                           (REGULAR CALENDAR)
      Defendant-Appellee.               :

D E C I S I O N

Rendered on May 8, 2014

*Mansell Law LLC*, and *Gregory R. Mansell*, for appellant.

*Vorys, Sater, Seymour and Pease LLP, Mark A. Knueve, John J. Kulewicz* and *Damien C. Kitte*; *Dinsmore & Shohl, LLP, Jan E. Hensell* and *Anjali Chayan*, for appellee Superior Production LLC.

*The Gittes Law Group, Frederick M. Gittes* and *Jeffrey P. Vardaro*, for Amici Curiae Ohio Employment Lawyers Association & Ohio NOW Education and Legal Defense Fund.

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} Plaintiff-appellant, Don O. Smith ("Smith"), appeals the Franklin County Court of Common Pleas decision granting a motion for judgment notwithstanding the verdict, entering judgment for defendant-appellee, Superior Production, LLC, on all counts, and conditionally granting a new trial. For the following reasons, we reverse the trial court's setting aside of the jury's verdict and remand the case for the verdict to be reinstated.

{¶ 2} Smith brings five assignments of error for our consideration:

[I.] THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON RACE DISCRIMINATION RELATED TO THE LAYOFF.

[II.] THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT FOR RETALIATION – RECALL.

[III.] THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON HOSTILE WORK ENVIRONMENT BASED ON RACE.

[IV.] THE TRIAL COURT ERRED BY HOLDING THE JURY'S AWARD WAS EXCESSIVE.

[V.] THE TRIAL COURT ERRED BY INSTRUCTING THE JURY TO DEDUCT UNEMPLOYMENT COMPENSATION FROM THE AWARD.

{¶ 3} Smith, an African-American, began working for Superior Production, LLC ("Superior"), a manufacturing company that produces parts for the automotive industry in the early 1980's as a press operator. Working many of the various jobs in the plant, Smith rose to the position of production supervisor in 2002 in charge of operating a whole production facility reporting directly to general management. Superior is owned, in part, by the Holstein family. Richard Holstein is the president and his two brothers Roger and Andy are vice presidents. All three of them are owners. Roger's son, Duane Holstein ("Holstein"), is the manufacturing manager, part owner, and was Smith's direct supervisor. In late 2008, Superior employed about 250 people and operated two facilities within walking distance of each other—one on Marion Road and the other on Fairwood Avenue.

{¶ 4} On October 20, 2008, Smith was working as production supervisor of the Marion Road plant when production was halted, which Holstein heard from his office. Smith testified that Holstein stormed out of his office and asked " 'what the fuck the presses stopped running for,' " and Smith replied that there was a problem with the tools.

Holstein then told Smith " 'Well, why don't you just sign out and go home, nigger?' " (Tr. Vol. II, at 153.) (The racial slur "nigger" hereinafter "n-word.") Holstein then immediately returned to his office. Smith clocked out, left the building, and walked to the other plant on Fairwood Avenue to talk to general manager, Paul Hook. Smith testified that he complained about the racially hostile work environment and his aversion to being directly supervised by Holstein because he was racist. Smith acknowledges he did not tell Paul Hook that Holstein used the n-word. Smith was transferred to the Fairwood plant on October 29 to a different shift and was demoted.

{¶ 5} In December 2008, Superior began laying-off employees due to the great recession and eventually laid-off 60 of its 250 employees. Smith was laid-off on December 17, 2008, he was the eighth employee to be terminated within the first round of layoffs, and the first employee in the production department. A major point of contention is whether discriminatory animus was a factor in Smith's termination and, if so, whether Smith would have been terminated anyway due to the economic down-turn.

{¶ 6} After some months, Superior began rehiring many of the recently terminated employees. Superior claims that it rehired employees based on their skills and the needs of the company. Smith, however, was not rehired despite his years of experience and former high position with Superior.

{¶ 7} On December 20, 2011, Smith filed a complaint against Superior alleging race discrimination, race-based retaliation, and a hostile work environment, as well as other claims. The trial court denied Superior's motion for summary judgment on November 28, 2012. A four-day jury trial commenced on March 19, 2013.

{¶ 8} Evidence, other than the October 20 incident, was presented to show the racial discrimination and intimidation that occurred at Superior. There was evidence of guns being used as a form of intimidation against African-Americans. Superior had a no drugs, alcohol, or firearms policy posted on their front doors yet management was apparently allowed to possess firearms and bring them to the factories. Smith testified that Holstein kept a handgun in his office and would deliberately cock the gun and set it on his desk when Smith was called into his office. Another African-American employee also testified that Holstein would deliberately set out the gun on his desk whenever he was

called to the office. Other evidence was presented that Holstein used the n-word and that such racial language was common and tolerated at Superior.

{¶ 9} The jury returned a verdict in favor of Smith on the claims of race discrimination, retaliation for failing to rehire Smith, and hostile work environment. The jury awarded $549,307.77 in damages. Superior filed a post-trial motion for judgment notwithstanding the verdict ("JNOV") under Civ.R. 50(B) or, in the alternative, for a new trial under Civ.R. 59(A). On July 16, 2013, the trial court issued a decision on Superior's post-trial motions. The trial court determined that there was insufficient evidence to support Smith's claims against Superior and granted Superior's motion for JNOV. The trial court also conditionally granted Superior's motion for a new trial, which was superseded by the JNOV. Smith appeals from these decisions by the trial court.

{¶ 10} A motion for JNOV is governed by Civ.R. 50(B):

> Whether or not a motion to direct a verdict has been made or overruled and not later than twenty-eight days after entry of judgment, a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion; or if a verdict was not returned such party, within twenty-eight days after the jury has been discharged, may move for judgment in accordance with the party's motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no verdict was returned the court may direct the entry of judgment or may order a new trial.

A motion for JNOV is used to determine whether the evidence is totally insufficient to support the verdict. *Harper v. Lefkowitz*, 10th Dist. No. 09AP-1090, 2010-Ohio-6527, ¶ 8. A motion for JNOV raises a question of law because the motion examines the " 'materiality of the evidence, as opposed to the conclusions to be drawn from the evidence.' " *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 680 (1998), quoting *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69 (1982).

{¶ 11} Neither the weight of the evidence nor the credibility of the witnesses is proper consideration for the trial court. *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976). The evidence "must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986), citing *Posin*. A favorable ruling on such a motion is not easily obtained. *Id.* Appellate review of a ruling on a motion for JNOV is de novo. *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, ¶ 14 (8th Dist.).

## I. *Race-based termination*

{¶ 12} Smith's first assignment of error argues the trial court erred in granting the JNOV on his claim of race discrimination related to being laid-off, contending that direct evidence was submitted. The trial court found that direct evidence does not support the conclusion that Smith was laid-off due to his race exclusively. We find that there was direct evidence that Superior was motivated by discriminatory animus in its decision to layoff Smith. We, therefore, sustain Smith's first assignment of error.

{¶ 13} It is unlawful discriminatory practice for "any employer, because of race * * * to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A). It is the practice of Ohio courts to refer to federal case law interpreting Title VII of the Civil Rights Act of 1964 in our analysis of R.C. Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981).

{¶ 14} Evidence of any nature that directly proves discrimination is sufficient to establish a prima facie case. *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996). Evidence can also be presented that indirectly proves discrimination to establish a prima facie case. This is done through the *McDonnell Douglas* test that was adopted by this state in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146 (1983). *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). "The function of the *McDonnell Douglas* prima facie test is to allow the plaintiff to raise an inference of discriminatory intent indirectly. It serves to eliminate the most common nondiscriminatory reasons for the employer's action: lack of qualifications

or the absence of a vacancy."  *Mauzy* at 583, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).  Indirect proof involves the application of certain inferences and presumptions to conclude that when most common nondiscriminatory reasons for an employment action are eliminated, there is an inference of discriminatory intent.  *Ferguson v. Lear Corp.*, 155 Ohio App.3d 677 (6th Dist.2003), citing *Mauzy* at 583-84.

{¶ 15} We reiterate that discrimination may be proved absent the framework of the *McDonnell Douglas* test.  "[W]e emphasized the notion that the four-element *McDonnell Douglas* prima facie test comes into play '*absent direct, circumstantial, or statistical evidence of discrimination.*' "  *Mauzy* at 584, quoting *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501, 505 (1991).

{¶ 16} Nor should there be any confusion about the use of "direct evidence" of discrimination to establish a prima facie case.  The term "direct evidence," as used in *Kohmesher* and *Barker,* "refers to the *method* of proof and the not the *type* of evidence" *Mauzy* at 583 (emphasis sic).  Direct evidence of discrimination is evidence of any nature, which if believed, is sufficient by itself to show the employer more likely than not was motivated by discriminatory animus in its action.  *Id.*, *Byrnes v. LCI Communication Holdings Co.*, 77 Ohio St.3d 125, 128-29 (1996); *Smith v. E.G. Baldwin & Assocs., Inc.,* 119 Ohio App.3d 410, 415 (10th Dist.1997).

{¶ 17} Once the plaintiff establishes that the employer was likely motivated by discriminatory animus, " 'the burden shifts to the defendant to demonstrate by a preponderance of evidence that the employer would have reached the same decision absent any discrimination.' "  *Corburn v. Rockwell Automation, Inc.*, 238 Fed.Appx. 112, 116 (6th Cir.2007), quoting *Carter v. Russo Realtors*, 10th Dist. No. 00AP-797 (May 22, 2001).

{¶ 18} The jury found that Smith had submitted direct evidence of discrimination with respect to Superior's decision to lay Smith off, as shown by answers on the jury interrogatories.  (*See* specifically, R. 114: Jury Interrogatories No. 1.) Direct evidence of racial discrimination was defined in the jury instructions:

> Direct evidence is evidence tied directly to the alleged discriminatory animus, and may include racial comments by

> decision makers or documentation containing--racially based information.
>
> Direct evidence of race discrimination can be proved by offering evidence of remarks that are race-related, proximate in time to the employment decisions at issue, made by an individual with authority over the employment decisions at issue, and related to the employment decisions at issue.
>
> If you find that Mr. Smith has proved by a preponderance of the evidence that (1) Mr. Duane Holstein of Superior Production LLC called Mr. Smith a nigger, (2) Mr. Holstein was involved in the decision to lay Mr. Smith off and not recall him, and (3) Mr. Holstein's use of word nigger was causally related to Superior's decision to lay Mr. Smith off and not recall him, then you must find in favor of Mr. Smith, unless Superior proves by a preponderance of the evidence that Mr. Smith would have been laid-off and not recalled independent of his race.

(R. 112; Jury Instructions No. 2, at 6.)  The jury instructions properly asked the jury to determine whether Holstein's animus, evidenced by his use of the n-word to Smith, was causally related to Superior's decision to layoff Smith.  The instructions also properly shift the burden to Superior to show that they would have laid-off Smith absent any discrimination.  However, the instructions improperly narrows what "direct" evidence can be used to prove discriminatory animus. Direct evidence of discrimination is evidence of any nature, which if believed, is sufficient by itself to show the employer more likely than not was motivated by discriminatory animus in its action.  *Mauzy*; *Byrnes*; *Smith.*

{¶ 19} The jury found, as indicated on the Jury Interrogatories, that Smith had submitted direct evidence with respect to Superior's decision to lay him off.  (R. 114, Jury Interrogatories No. 1.)  The jury also found that Smith's race was a motivating factor in his termination and Superior would not have laid-off Smith anyway based on legitimate business reasons.  (R. 114, Jury Interrogatories No. 2, at 6.)  The jury found for Smith on the claim of racial discrimination.

{¶ 20} In our de novo review, construing the evidence most strongly in favor of Smith, reasonable minds can conclude the jury found by a preponderance of the evidence that there existed a discriminatory animus towards Smith.  A plaintiff may establish a

prima facie case by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent. *Byrnes* at 128-29. There was a great deal of evidence presented that could lead to this conclusion; Holstein used the n-word directly to Smith, that both staff and management commonly used the n-word at work with little or no reprimand, and that Holstein used a gun to intimidate African-American employees.

{¶ 21} The jury could also properly determine the fact that Holstein was involved in the decision to layoff Smith based on the evidence presented of Holstein being a decision maker. Holstein was management, part owner, member of the owning family, and was supervisor of Smith for many years. One of the justifications Superior gave at trial for not rehiring Smith was that he would have been supervised by Holstein.

{¶ 22} Sometime after Smith was laid-off, Holstein was having a conversation with Mark Campbell, an African-American employee. Mark Campbell was reviewing with Holstein a group of temporary employees when Holstein brought up Smith and asked if Campbell still talked to him. Campbell responded that he did not speak to Smith anymore to which Holstein replied "I hate a dumb ass [n-word]." (Tr. Vol. III, at 430.) This conversation shows both that Holstein held a deep animus to Smith and that he was clearly involved in the hiring process at Superior.

{¶ 23} Further, there is testimony from Holstein that he was involved in the layoff process:

> Q. Let's talk about the layoffs. You were involved in that process, right?
>
> A. My recommendations on the job analysis, yes.
>
> Q. Yeah, you consulted with Mr. Hook about the decision to lay off people?
>
> A. No. I gave the employees who would best suit the jobs.
>
> Q. So you gave Mr. Hook information about what employees you would want to keep?
>
> A. HR, and it got to Paul, yes.

(Tr. Vol. III, at 327.) There was also testimony from Superior's human resource department that Holstein was involved in the layoffs and had some say-so in who he thought the strongest employees were. (Tr. Vol. III, at 406.)

{¶ 24} This evidence stands in contrast to other cases where no nexus was found between discriminatory actions and the discharge of an employee. In *Byrnes*, the Supreme Court of Ohio determined that there was "no link or nexus between the remarks and plaintiffs' discharges that could logically support the inference that the discharges were the result of discriminatory intent." *Id.* at 129. The court noted that remarks by LCI executives were either years removed from the firing nor related to the plaintiffs themselves. An isolated statement about Alzheimer's which could be characterized as inappropriate and insensitive was insufficient to form the basis of a claim of age discrimination. *Id.* The court noted that the vast majority of the evidence had nothing to do with age discrimination. *Id.* "There must be a link or nexus between the discriminatory statement or conduct and the prohibited act of discrimination to establish a violation of the statute." *Id.* at 130. The plaintiffs presented an isolated comment that plaintiff might have Alzheimer's disease was not tied in time or fact to the terminations in the case. Consequently, there was insufficient evidence to support the jury's findings that the plaintiffs were discharged on account of their age. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee." *Id.* at 130.

{¶ 25} The evidence in the case at bar is distinguishable to that presented in *Byrnes*, and focuses a great deal on racial discrimination. Having concluded that the jury could determine that the n-word was used and that Holstein had a part in firing Smith, we examine whether there is a link or nexus that Smith's discharge was the result of discriminatory intent. Constructing the evidence in favor of Smith, we determine that perhaps the most offensive word in the English language was used directly by Smith's supervisor in telling him to clock out and leave. As a result, Smith, no longer willing to work under Holstein, was moved to another facility, demoted in title and pay, and worked on another shift. This same supervisor was involved in the decision to layoff Smith two months later. There was a culture of discrimination at Superior evidenced by the

common use of the n-word by both staff and management, including the owners as well as the lack of reprimands for use of the word. Holstein also used a gun to intimidate African-Americans during meetings in his office.

{¶ 26} All of this evidence demonstrates that it was more likely than not that Superior was motivated by discriminatory animus. We find the jury properly found there was evidence presented that directly showed that racial discrimination was a factor in Smith's firing.

{¶ 27} The burden then shifts to Superior to show, by a preponderance of the evidence, that Smith would have been laid-off absent any discrimination. There was evidence presented that only about 60 employees were initially terminated, with Superior beginning to rehire again within six months. Smith was laid-off despite another production supervisor and an assistant production supervisor being retained. (Tr. Vol. III, at 360.) There was also evidence that Superior sought to retain employees who could perform multiple jobs and provide the most flexible and skilled labor force. Superior typically tried to push down from the top of the workforce, to layoff only the bottom employees, but this was not the case with Smith. (Tr. Vol. III, at 362.) Smith was the first production employee laid-off and only the eighth employee overall. (Tr. Vol. III, at 406.) Viewing the evidence most favorably for Smith, the jury could find that Smith, who was a production supervisor, who had performed every job on the production floor, and had over two decades experience, would not have been terminated but for his race.

{¶ 28} Upon review of the record, we conclude that there is substantial evidence to support Smith's case upon which reasonable minds could reach different conclusions, one of which the jury accepted as true. Smith was able to prove directly that, but for racial discrimination, he would not have been terminated from Superior. The granting of a JNOV is inappropriate on Smith's claim of an impermissible termination based on racial discrimination. The JNOV for the racial discrimination claim is overturned.

{¶ 29} The first assignment of error is sustained.

## II. *Race based retaliation - recall*

{¶ 30} Smith's second assignment of error argues the trial court erred by granting the JNOV when the jury had found that Superior had retaliated by choosing not to recall

Smith because Smith had complained about racial discrimination. We find that the trial court improperly granted the JNOV for racial retaliation.

{¶ 31} It is unlawful for any person to discriminate in any manner against any other person because that person had opposed any unlawful, discriminatory practice. R.C. 4112.02(I). Ohio's anti-retaliation law has a broader scope than Title VII because it is not limited to people in an employer-employee relationship. *LeMasters v. Christ Hosp.*, 777 F.Supp. 1378, 1381-82 (S.D.Ohio 1991).

{¶ 32} To establish a case of retaliation, a claimant must prove that: (1) he engaged in a protected activity; (2) the defending party was aware that the claimant had engaged in that activity; (3) the defending party took an adverse employment action against the employee; and (4) there is a causal connection between the protected activity and adverse action. *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990). In order to establish a causal connection, a plaintiff must produce "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Gibson v. Shelly Co.*, 314 Fed.Appx. 760 (6th Cir.2008). The plaintiff must prove that retaliation is the but-for cause of adverse employment action. *Smith v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 60. "[T]o prevail on a retaliation claim, a plaintiff must show that retaliation is a determinative factor—not just a motivating factor—in the employer's decision to take adverse employment action. Thus, the causation standard imposed in retaliation cases (but-for causation) is a higher standard than that applied in USERRA or Title VII discrimination claims ('motivating factor')." *Id.* at ¶ 59; *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2533 (2013).

{¶ 33} Temporal proximity can be evidence of a causal connection. The lack of temporal proximity does not doom a retaliation claim. Retaliation has been found when termination followed the protected activity by over one year. *Harrision v. Metro. Govt. of Nashville*, 80 F.3d 1107, 1119 (6th Cir.1996), *overruled on other grounds* by *Jackson v. Quanex Corp.*, 191 F.3d 647, 667 (6th Cir.1999). In order to overcome a lack of temporal proximity, " '[w]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple

temporal proximity with other evidence of retaliatory conduct to establish causality.' " *Gibson,* quoting *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir.2008).

{¶ 34} In regard to the level of seriousness a harm must rise to, before becoming actionable retaliation, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Hughes v. Miller*, 181 Ohio App.3d 440, 448, 2009-Ohio-963 (10th Dist.), citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

{¶ 35} If a complaint establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate reason for its actions. *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 327, 2007-Ohio-6442, quoting *McDonnell Douglas Corp.* "If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate 'that the proffered reason was not the true reason of the employment decision.' " *Greer-Burger*, quoting *Texas Dept. of Community Affairs.*

{¶ 36} The jury interrogatories show the jury found that Superior's decision not to recall Smith was causally related to his complaint about race discrimination. (R. 114, Jury Interrogatories No. 16.) The jury also found that Superior had a legitimate and non-retaliatory reason for not recalling Smith but the stated reasons for laying Smith off were pretextual. R. 114, Jury Interrogatories No. 17, 18.) A jury's credibility determination is entitled to "special deference." *Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir.1985).

{¶ 37} The trial court found that there were inconsistencies in the jury interrogatories, but regardless of these inconsistencies, the evidence is wholly insufficient to support the verdict that Superior retaliated against Smith in failing to recall him. The trial court found that Superior's stated reason for laying off and not rehiring Smith was not proved as pretextual:

> The Court reaches this conclusion based on the testimony of Ms. Hager, who explained (initially on cross exam) that as a need developed for a laborer with a certain skill set, the manager or supervisor of the department would suggest/request an individual be re-hired. The manages involved included Todd Dobson, the die bay supervisor, Mike Carlini, the machine bay supervisor, Joe Grande the manufacturing manager on the second shift at the Fairwood

plant. Duane Holstein would have had some say so, 'but he would have got that through the supervisors versus making the independent decisions.' Specifically, with regard to Superior's decision not [to] re-hire Plaintiff, Ms. Hager testified, "the decision not to recall Plaintiff had nothing to do with race." Mr. Hook agreed. The "overriding reason" he was not recalled, Ms. Hager explained, was because "Mr. Smith's skill set was a little more in line with the press bay area. And Duane Holstein was supervising the press bay area for both facilities." Because Mr. Smith did not want to work for Duane Holstein in any capacity, it affected the decision as to whether or not he should be recalled.

(Citations omitted.) (Decision, at 17-18.) The trial court also cited Holstein's testimony that he ran into Smith at an Autozone where Smith explained he was happy in another job and had no interest getting back into the trade Superior was involved in.

{¶ 38} The trial court fails to sight any evidence in its decision that was presented at trial that Superior's reasons were pretextual and found that the evidence was insufficient to establish that, but for Smith's complaint about Holstein, the decision to not re-hire Smith would not have been made. The trial court also states that, even assuming Smith engaged in a protected activity that was causally linked to him not being rehired, there was a legitimate business reason for not rehiring Smith that was failed to be proven as pretext and that Smith would be supervised by Holstein for whom he was not willing to work.

{¶ 39} In our de novo review, construing the evidence most strongly in favor of Smith, reasonable minds can conclude the jury found by a preponderance of the evidence the fact that Smith engaged in protected activity of complaining about how he was treated because of his race; that, but-for this complaint, Smith would have been rehired; and that Superior's alternative reasoning for failure to rehire Smith was pretextual.

{¶ 40} It is clear that the jury concluded that Smith engaged in protected activity on October 20, 2008, when he complained about Holstein's treatment of him. The jury also concluded that Smith was a highly skilled employee that worked well for decades at Superior and would have been rehired but-for complaining about Holstein. There was evidence presented that Smith had a diverse and desirable skill set. (Tr. Vol. III, at 305, 333.) Smith had the ability to perform multiple jobs which would be desirable to Superior

who was trying to operate with less staff. *Id.* at 333. There is evidence from Holstein that Smith was good at his job. Holstein, though a Supervisor for many years at Superior, did not recall ever needing to counsel Smith about his work performance. (Tr. Vol. III, at 322-23, 424.)

{¶ 41} The jury could also make the determination that Superior's proffered reason for not rehiring Smith was pretextual. When establishing a proffered reason is pretext "[i]f the plaintiff shows that that employer's explanation is not credible, the trier of fact may, but does not have to, draw the inference of intentional discrimination without any further evidence of discrimination." *Brock v. Gen. Elec. Co.*, 125 Ohio App.3d 403, 408 (1st Dist.1998); *Jelinek v. Abbott Labs.*, 10th Dist. No. 11AP-996, 2013-Ohio-1675.

{¶ 42} General Manager, Paul Hook, testifying for Superior, originally was not sure why Smith was laid-off so early in the force reduction. On direct examination, the following day, Hook changed his answer. (Tr. Vol. III, at 363-64; Tr. Vol. IV, at 529.) Paul Hook also testified that, on October 20, 2008, Smith did not mention anything about race in connection with Holstein. The jury could easily find that Paul Hook was not credible as to the reasoning he offered for not rehiring Smith. The jury could also find that human resource representative, Michele Hager, was not credible when she testified that layoffs were based on skill set and work performance but, in a request for admissions, had previously sworn that the decision to layoff was not based on work performance. (Tr. Vol. III, at 406-408.) Smith presented evidence that Superior's explanation was not credible. It was therefore permissible for the jury to draw the inference of intentional discrimination. *Brock.*

{¶ 43} Further, if the jury believed that Holstein was acting like a racist, then Smith's desire not to be directly supervised by Holstein can be viewed by the jury as not being a legitimate business reason for failing to rehire him, and would further damage Holstein's credibility. This view is especially reasonable since Superior had multiple facilities and shifts in which Smith could work and not be supervised by Holstein. (Tr. Vol. III, at 343.) Superior could also have changed Duane Holstein's position so that he was not a manufacturing manager, an occurrence which happened anyway when Holstein became a safety manager. (Tr. Vol. III, at 317.) Reasonable minds can conclude that the

jury properly found that Superior's proffered reasons for failing to rehire Smith were pretextual.

{¶ 44} We find that in viewing the evidence most favorably for Smith, the jury could find that sufficient evidence was presented to establish all the elements of retaliation. The trial court improperly weighed the credibility of the witnesses, acted as the finder of fact, and disregarded the lawful conclusions of the jury.

{¶ 45} The second assignment of error is sustained.

### III. *Hostile work environment*

{¶ 46} Smith's third assignment of error claims the trial court erred in granting a JNOV on the hostile work environment claim. For the following reasons, the trial court erred in granting the JNOV.

{¶ 47} To prove a hostile working environment claim based on race, the plaintiff must establish: (1) the employee was a member of the protected class; (2) the harassment of the employee was unwelcome; (3) the harassment complained of was based on race; (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment; and (5) respondeat superior (employer) liability. *Zacchaeus v. Mt. Carmel Health Sys.*, 10th Dist. No. 01AP-683 (Feb. 5, 2002); *Harris v. Forklift Sys.*, Inc., 510 U.S. 17 (1993).

{¶ 48} In order to satisfy the fourth prong that the working environment was sufficiently hostile, this requires the trier of fact to look at all of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance. *Zacchaeus*, citing *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998). Determining whether an environment is sufficiently hostile or abusive, requires consideration of all the circumstances, not any one factor. *Chapa v. Genpak, LLC.*, 10th Dist. No. 12AP-466, 2014-Ohio-897 ; *Harris.*

{¶ 49} "The reason why this standard should be followed is 'to ensure that courts and juries do not mistake ordinary socializing in the workplace * * * for discriminatory "conditions of employment." ' " *Bertolini v. Whitehall City School Dist. Bd. of Edn.*, 139 Ohio App.3d 595, 606-07 (2000), quoting *Oncale v. Sundowner Offshore Serv., Inc.*, 523

U.S. 75 (1998). Conduct must be extreme to constitute a change in the terms and conditions of employment. *Faragher.* In order to constitute actionable abusive work environment harassment under Title VII, the conduct is not required to seriously affect an employee's psychological well-being or lead the employee to suffer injury. *Cerett v. Timken Co.*, 5th Dist. No. 2006CA0056, 2006-Ohio-5892, ¶ 24, citing *Harris* at 20.

{¶ 50} The jury found that Smith was subject to unwelcome racial conduct that was severe, physically threatening or humiliating, and interfered with Smith's work performance. The jury found for Smith on his hostile work environment claim.

{¶ 51} The trial court in granting the JNOV found Holstein's use of the n-word on October 20, 2008 was an isolated incident during Smith's long tenure and merely an offensive utterance, rather than being threatening or humiliating. First, this was an improper weighing of the evidence by the trial court. *Posin* at 275. We find that the trial court did not construe this evidence most strongly in favor of Smith. *Osler* at 347. Reasonable minds can easily conclude that Holstein's use of the n-word, directly to Smith, while on the production floor, at the same time telling him to go home, was humiliating. The trial court also disregarded the other testimony, including testimony about laying a cocked firearm on the desk when Holstein talked to Smith.

{¶ 52} Further, the trial court improperly discounted other evidence of a hostile work environment. The trial court argued that racially offensive language was bantered around the plant, but it was not humiliating because it was not directed at Smith most of time. The trial court also argued that Smith was not subject to a hostile work environment even though he was intimidated when Holstein would routinely pull his gun out of a drawer, cock it, and then set it on the desk when meeting with Smith. (Decision, at 22-23.) The trial court's reasoning for this is because Holstein would not get his gun out when meeting with a large group of employees. (Decision, at 23.) It is clear the trial court was weighing evidence, a question of fact, rather than determining the materiality of the evidence, a question of law.

{¶ 53} The third assignment of error is sustained.

## IV. *New Trial*

{¶ 54} We find Smith has also appealed the conditional granting of a new trial. Superior argues that Smith failed to appeal the conditional granting of a new trial. The trial court found that the compensatory damages award was excessive and commented that the jury interrogatories were "inconsistent but undecipherable" when examining whether to grant a new trial under Civ.R 59(A)(4). (Decision, at 26.) The trial court found the question as to granting a new trial under Civ.R. 59(A)(4) moot as it granted a new trial under Civ.R. 59(A)(6).

{¶ 55} The trial court's conditional granting of a new trial, because the damage award was not sustained by the weight of the evidence, is based only upon the trial court's analysis in conjunction with the granting of JNOV. The trial court does not make any additional findings. Smith clearly appealed every aspect of the granting of the JNOV and we must then conclude that, in this case, Smith appealed the conditional granting of a new trial under Civ.R. 59(A)(6). We are also guided by our prior decision in *Jelinek*:

> Significantly, in this appeal, plaintiff has not separately assigned as error the trial court's conditional granting of a new trial as to the issue of plaintiff's age-discrimination claim, but he does argue that the motion for a new trial should have been denied. Civ.R. 50(C) provides that if the motion for JNOV provided for in Civ.R. 50(B) is granted, then the court shall rule on the motion for a new trial. Thus, the trial court's decision regarding a new trial was a necessary determination given its granting of the JNOV. Therefore, we find it necessary to address the issue of whether the trial court erred in conditionally granting a new trial.

*Id.* at 621.

{¶ 56} We also note that "[w]hen granting a motion for a new trial based on the contention that the verdict is not sustained by the weight of the evidence, the trial court must articulate the reasons for so doing in order to allow a reviewing court to determine whether the trial court abused its discretion in ordering a new trial." *Antal v. Olde Worlde Products, Inc.*, 9 Ohio St.3d 144 (1984), syllabus. Because of the differing standards of error, it becomes necessary for a trial court when granting a JNOV and conditionally granting a new trial to set forth a different analysis that would apply to a

new trial but not a JNOV. As noted above, the trial court impermissibly weighed evidence in deciding the motion to grant a JNOV. The trial court failed to articulate the reasons for granting the new trial other than its reasoning for granting the JNOV, which Smith appealed. We therefore address whether the trial court erred in conditionally granting a new trial where its analysis in granting a JNOV was incorrect.

{¶ 57} Civ.R. 59(A)(6) states in part:

> A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
>
> * * *
>
> (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]

"When presented with a motion premised on Civ.R. 59(A)(6), a trial court weighs the evidence and considers the credibility of the witnesses to determine whether the manifest weight of the evidence supports the judgment." *Ellinger v. Ho*, 10th Dist. No. 08AP-1079, 2010-Ohio-553, ¶ 61. "Judgments supported by some competent, credible evidence going to all essential elements of the case will not by reversed by a reviewing court as being against the manifest weight of the evidence." *C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 280 (1978).

{¶ 58} An appellate court reviews the grant or denial of a motion for new trial under an abuse of discretion standard. *Thomas v. Columbia Sussex Corp.*, 10th Dist. No. 10AP-93, 2011-Ohio-17, ¶ 16. The abuse of discretion standard requires our court to " 'view the evidence favorably to the trial court's action rather than to the original jury's verdict.' " *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440 (1996), quoting *Rohde v. Farmer*, 23 Ohio St.2d 82 (1970). This deference to the trial court's grant of a new trial stems in part from the recognition that the judge is better situated than a reviewing court to pass on questions of witness credibility and the " 'surrounding circumstances and atmosphere of the trial.' " *Malone* at 448, quoting *Rohde* at 94. An abuse of discretion occurs where a trial court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 59} We now must re-examine the trial court's reasoning in granting the JNOV to see if it abused its discretion in granting a new trial, particularly with an eye towards the weighing of evidence and the credibility of witnesses which was previously impermissible under a JNOV analysis. This mixed reasoning analysis is a problem that adherence to the syllabus of *Antal* would avoid.

{¶ 60} First, as previously discussed, Smith's claim for racial discrimination under R.C. 4112.02(A) may be proved by evidence of any nature, direct or indirectly that Superior was motivated by discriminatory animus. The burden would then shift to Superior to demonstrate by a preponderance of the evidence that the employer would have reached the same decision absent any discrimination.

{¶ 61} We cannot agree with the trial court's granting of a new trial as to liability. Smith was demoted after a member of the family which owns Superior demeaned him personally. Then despite his 20 years of service to the company, Smith was one of first employees to be laid-off. Smith and other African-American employees were demeaned and intimidated by having a loaded firearm placed in front of them and cocked when conversations were held with a white member of the management team, especially a white manager who was a member of the family which owned the business. Then when an economic downturn occurred, Smith was one of the first to be laid-off and he was never recalled, despite his extended service to Superior in all levels of work and management. Given those facts, Superior's liability was clear. The trial court abused its discretion in overturning the jury's finding as to liability, especially given the clear findings on that issue reflected in the jury's interrogatories.

{¶ 62} Having made that finding, we then turn to an analysis of the damage award. Again, we are governed by an abuse of discretion standard. Stated simply, we cannot tell from the record before us the basis for the jury awards as to compensatory damages and punitive damages. Therefore, we cannot find that the trial court judge abused his discretion in setting aside those damage awards. We also cannot say the damage awards were excessive, especially the punitive damages.

{¶ 63} The jury may well have been offended by the conduct of Superior and its employees both at the business premises and on the witness stand at trial. Still, the jury must award damages which closely corresponds to the evidence presented at trial. The

judge who heard the case found that the damage award was inappropriate. We cannot overturn that finding, given the abuse of discretion standard we must apply.

{¶ 64} As a result, we overrule the fourth assignment of error.

{¶ 65} We do not find that it was error to offset the compensatory damage award with unemployment compensation received. We therefore overrule the fifth assignment of error.

{¶ 66} In review, we sustain the first, second, and third assignments of error. We overrule the fourth and fifth assignments of error. We vacate the trial court's granting of a JNOV. We remand the case for the trial court to reinstate the findings of liability as determined by the jury. We also remand the case for new proceedings to determine appropriate compensatory and punitive damages.

*Judgment affirmed in part and overruled in part; case remanded for further proceedings.*

CONNOR, J., concurs.
KLATT, J., concurs in part and dissents in part.

KLATT, J., dissenting in part and concurring in part.

{¶ 67} I respectfully dissent in part and concur in part with the majority decision. I dissent because I believe the trial court did not err when granting Superior judgment notwithstanding the verdict on Smith's claims for race discrimination and retaliation. I concur with the majority's conclusion that the trial court erred in granting Superior judgment notwithstanding the verdict on Smith's claim for hostile work environment, but I disagree with the conclusion that the trial court erred in granting a new trial on that claim.

{¶ 68} Smith contends that he established sufficient "direct evidence" of race discrimination to avoid the entry of judgment notwithstanding the verdict. In Ohio, the phrase "direct evidence" has different meanings depending on the context in which it appears. First, a plaintiff may establish a discrimination claim through direct evidence as opposed to proceeding under the *McDonnell Douglas* formula. In this context, direct evidence of discrimination " 'is evidence that proves that discrimination has occurred without requiring further inferences.' " *McFee v. Nursing Care Mgt. of Am., Inc.*, 126

Ohio St.3d 183, 2010-Ohio-2744, ¶ 34; *accord Dautartas v. Abbott Laboratories.*, 10th Dist. No. 11AP-706, 2012-Ohio-1709, ¶ 35 (" 'Direct evidence of discriminatory intent requires more than just conjecture—it should be evidence that can be interpreted as an acknowledgement of discriminatory intent by [the employee's] supervisors.' ").   If a factfinder accepts the plaintiff's direct evidence, then the employer's legitimate, nondiscrimatory reason, which merely satisfies a burden of production under the *McDonnell Douglas* framework, becomes an affirmative defense.  *Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir.2000).   Therefore, once a plaintiff produces direct evidence of discrimination, " 'the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination.' "   *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003); *accord Chapa v. Genpak, LLC*, 10th Dist. No. 12AP-466, 2014-Ohio-897, ¶ 89.

{¶ 69} Second, a plaintiff may use "direct evidence" to establish a prima facie case under the *McDonnell Douglas* formula.  *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 586-87 (1996).  In other words, providing "direct evidence" is an alternative to satisfying the four-element prima facie test set forth in *McDonnell Douglas*.   *Byrnes v. LCI Communication Holdings Co.*, 77 Ohio St.3d 125, 148 (1996).   In this context, the phrase "direct evidence" is a misnomer, in that it refers to evidence of any nature (either direct or circumstantial) that shows that an employer was more likely than not motivated by discriminatory animus.  *Mauzy* at 586-87.   If the plaintiff establishes a prima facie case using the *Mauzy* method, the burden of production shifts to the employer to present a legitimate, nondiscriminatory reason for taking the adverse employment action against the employee.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).   The plaintiff then must prove that the legitimate, nondiscriminatory reason is a pretext for discrimination.  *Id.* at 515.

{¶ 70} Here, before the trial court, Smith asserted two theories of recovery based on his claim for race discrimination:  (1) he was entitled to recover because Holstein's use of a racial slur was direct evidence of discrimination, and (2) he established his race discrimination claim by satisfying the typical four-element *McDonnell Douglas* prima facie test and proving Superior's legitimate, nondiscriminatory reason was a pretext for discrimination.  (R. 48, at 12-19; R. 140 at 6.)   The majority decision assumes that Smith

relied on the *Mauzy* alternative method of demonstrating a prima facie case, and it analyzes the race discrimination claim using the combined *Mauzy/McDonnell Douglas* framework. I believe that this analysis wrongly allows Smith to alter his theory of recovery on appeal and prevail on a theory that he waived by failing to raise it. *State ex rel. Ohio Civ. Serv. Emp. Assn., AFSCME, Local 11, AFL–CIO v. State Emp. Relations Bd.,* 104 Ohio St.3d 122, 2004-Ohio-6363, ¶ 10 (" 'Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed.' "); *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections*, 65 Ohio St.3d 175, 177 (1992) ("Appellant cannot change the theory of his case and present these new arguments for the first time on appeal."). I will instead review Smith's race discrimination claim as he argued it before the trial court.

{¶ 71} As I explained above, outside of the context of the prima facie case, direct evidence is evidence, which if believed, proves the existence of discrimination without inference or presumption. Thus, direct evidence usually comes in the form of an employer's statement that it is firing an employee because of the employee's inclusion in a statutorily protected class. *Murphy v. Univ. of Cincinnati*, 72 Fed.Appx. 288, 294 (6th Cir.2003); *accord Erwin v. Potter*, 79 Fed.Appx. 893, 897 (6th Cir.2003) ("[T]he statement 'I fired you because you are disabled' [is] an example of direct evidence."). As employers generally do not announce that they are acting on prohibited grounds, direct evidence of discrimination is rare. *Id.* at 896-97.

{¶ 72} To prevail based on direct evidence, a plaintiff must show that the employer acted on its discriminatory animus, not just that it possessed one. *Suits v. Heil Co.*, 192 Fed.Appx. 399, 403 (6th Cir.2006). Thus, a plaintiff must show a direct correlation between the evidence of discrimination and the specific employment decision in question. *Shepard v. Griffin Servs., Inc.*, 2d Dist. No. 19032, 2002-Ohio-2283, ¶ 18; *accord Bolander v. BP Oil Co.*, 128 Fed.Appx. 412, 416 (6th Cir.2005) ("[S]tatements that are 'unrelated to the decisional process' at issue [ ] do not constitute 'direct evidence.' "). For a discriminatory remark to constitute direct evidence of discrimination, the remark must be: (1) made by the decisionmaker or one whose recommendation is sought by the decisionmaker, (2) related to the specific decision challenged, and (3) made close in time to the decision. *Chapa*, 2014-Ohio-897, at ¶ 91.

{¶ 73} Here, Smith claimed that Holstein's statement that, "[w]ell, why don't you just sign out and go home, n____?," constituted direct evidence of discrimination.[1] (Tr. Vol. II, 153.) However, Holstein's comment did not relate to the employment decision at issue, i.e., Smith's layoff. Rather, Holstein's comment occurred during the midst of a confrontation over the production lines going down. Smith was not laid off until months later. While I condemn the use of "n____," I find that Holstein's use of that racial slur is not direct evidence of discrimination in this case.

{¶ 74} I next consider whether Smith established his claim for race discrimination by indirect evidence. Under the *McDonnell Douglas* evidentiary framework, the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. Typically, to do so, the plaintiff must present evidence that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position he lost; and (4) either he was replaced by someone outside the protected class or a non-protected, similarly situated person was treated better. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir.1992) (discussing the fourth element).

{¶ 75} Here, as Superior points out, Smith presented no evidence to prove the fourth element of the prima facie case. Another African American replaced Smith, and Smith failed to identify a non-protected, similarly situated individual who Superior treated better. Smith does not contest this evidentiary failing, but rather argues that this court cannot consider the merits of his prima facie case. Smith is incorrect. Unlike the federal appellate courts, Ohio appellate courts may review the prima facie case in an appeal after a trial on the merits. *Smith v. Dept. of Pub. Safety*, 10th Dist. No. 12AP-1073, 2013-Ohio-4210, ¶ 51, fn. 2. After reviewing Smith's evidence, I find that he failed to prove a *McDonnell Douglas* prima facie case.

{¶ 76} Before moving on, I must address the majority's ruling that Smith proved a prima facie case under *Mauzy*. First, I reject Smith's contention, which the majority accepts, that Holstein's display of his gun is evidence of racial animus. Smith and

---

[1] Smith later testified that Holstein said, "[O]kay, just sign out and go home, n__." (Tr. Vol. II, 192.)

Campbell each testified that Holstein would place his gun on his desk during one-on-one meetings with them. This testimony raises two equally plausible possibilities: (1) Holstein displayed his gun in one-on-one meetings with only African-American subordinates, or (2) Holstein displayed his gun in one-on-one meetings with all subordinates. A fact finder may not base an inference on evidence that merely raises conjecture or possibility. *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 333 (1955); *accord Sharp v. Andersons, Inc.*, 10th Dist. No. 06AP-81, 2006-Ohio-4075, ¶ 7 (" 'A probative inference for submission to a jury can never arise from guess, speculation or wishful thinking.' "). As the evidence here only produces possibilities, I find that no factfinder could deduce from that evidence that Holstein exhibited racial animus through use of his gun.

{¶ 77} The majority decision also points to management's common use of "n____" in the workplace as evidence of discriminatory animus. Smith testified that, during the ten-year period between 1998 and 2008, he heard five people—three co-workers, one of Superior's owners, and Holstein—refer to African Americans as "n____s" in the workplace. Smith, however, failed to testify as to how frequently he heard that racial slur.[2] Given this gap in the evidence, I do not believe that a factfinder could conclude that the use of "n____" was common.

{¶ 78} Second, the evidence does not prove that the name calling at issue related to Smith's layoff. Under the *Mauzy* test, a plaintiff does not establish a prima facie case of discrimination unless he proves "a link or nexus between the discriminatory statement or conduct and the prohibited act of discrimination to establish a violation of the statute." *Byrnes*, 77 Ohio St.3d at 130. As we discussed above, Smith failed to prove a connection between Holstein's calling Smith a "n____" and Smith's layoff. Moreover, although Smith testified that others (besides Holstein) used racial slurs, he did not state when he heard those slurs. Smith, therefore, did not establish that any name calling occurred at the time that Superior made the decision to lay him off. Smith also did not demonstrate that the other people who he heard use the word "n____" were involved in the decision to lay him

---

[2] In his only testimony regarding frequency, Smith stated that: (1) with regard to the use of racially offensive language, the situation when he returned to Superior in 1998 had improved "a lot" compared to the 1980's, and (2) he heard Superior's owner and Holstein each say "n____" once during the time he worked with them. (Tr. Vol. II, 149.)

off. Without such evidence, Smith cannot show a connection between the name calling and his layoff.

{¶ 79} In conclusion, after construing the evidence most strongly in Smith's favor, I find it insufficient to establish a claim for race discrimination. Accordingly, I would overrule Smith's first assignment of error.

{¶ 80} By his second assignment of error, Smith argues that the trial court erred in granting judgment notwithstanding the verdict on his retaliation claim. For me, the issue here is whether Smith presented sufficient evidence to prove that the legitimate, nondiscriminatory reason that Superior offered for not recalling Smith was pretext for discrimination.

{¶ 81} Once a plaintiff proves a prima facie case and the employer produces a legitimate, nondiscriminatory reason, the inquiry turns to the "specific proofs and rebuttals of [retaliatory] motivation the parties have introduced." *Hicks,* 509 U.S. at 516. At that point, the plaintiff's burden to prove pretext merges with the plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully retaliated. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action. *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2528 (2013). In other words, to prevail on a retaliation claim, the plaintiff must show that retaliation was a determinative factor—not just a motivating factor—in the employer's decision to take adverse employment action. *Smith*, 2013-Ohio-4210, at ¶ 59.

{¶ 82} Michelle Hagar, Superior's human resources manager, testified to the process Superior used to recall laid-off employees. Hagar stated that when a supervisor identified the need for a worker with a particular skill, the supervisor would contact her. Hagar would generate a list of laid-off employees with the skill at issue, and the supervisor would select a person from the list to recall. None of the supervisors chose Smith. The "overriding reason" for rejecting Smith was "that Smith's skill set was a little more in line with the press bay area [ ] [a]nd Duane Holstein was supervising the press bay areas for

both [of Superior's] facilities."[3]  (Tr. Vol. III, 472-73.)  Because Smith refused to work with Holstein, Smith was not recalled.[4]

{¶ 83} In order to prevail, Smith had to prove retaliation for his complaint of a hostile work environment—and not his refusal to work with Holstein—was the determinative reason for Superior's failure to recall him.  Smith argues, and the majority accepts, that Superior's "overriding reason" for not recalling him does not qualify as a legitimate, nondiscriminatory reason.  I reject this premise.  Both Title VII and R.C. 4112.02(I) prohibit an employer from discriminating against a person because he or she has opposed any unlawful discriminatory practice.  Thus, as long as an employer offers a reason for taking an adverse employment action other than the plaintiff's opposition to an unlawful discriminatory practice, the employer has articulated a legitimate, nondiscriminatory reason for its action.  *Ayers-Jennings v. Fred's Inc.*, 461 Fed.Appx. 472, 480 (6th Cir.2012) (" 'A reason is legitimate for purposes of the civil rights laws if it is nondiscriminatory, even if it is mean-spirited, ill-considered, inconsistent with humane personnel practices, or otherwise objectionable.' ").  While Superior's reason is not particularly fair to Smith, it is a motive other than unlawful retaliation.

{¶ 84} Next, Smith argues, and the majority accepts, that Superior could have recalled Smith to work a position in the press bay area that was not under Holstein's supervision.  However, Paul Hook, Superior's general manager, testified that Holstein managed the press bay areas for both of Superior's facilities during the period in which Superior was recalling employees.  Hook explained that Superior could have recalled Smith to a press bay position where Smith "wouldn't have been a direct report [to Holstein], but [the position] would have still been under Duane [Holstein]."  (Tr. Vol. III, 343.)  Thus, no matter the facility or shift, a position calling for Smith's skill set would fall under Holstein's management.

---

[3] Paul Hook, Superior's general manager, concurred with Hagar, testifying that Superior did not recall Smith "primarily because * * * the manufacturing area was under Duane Holstein and [Smith's] desire not to work for Duane."  (Tr. Vol. IV, 531.)

[4] When Smith complained to Hook about the hostile work environment, Smith did not tell Hook that Holstein called him a "n____."  Thus, neither Hook nor Hagar knew that Smith's refusal to work with Holstein arose from Holstein's use of that racial slur.

{¶ 85} In sum, I conclude that Smith did not present sufficient evidence to prove that Superior's reason for not recalling him was a pretext and that retaliation was the actual, determinative reason for Superior's action. I, therefore, would overrule Smith's second assignment of error.

{¶ 86} By his third assignment of error, Smith argues that the trial court erred in granting judgment notwithstanding the verdict on Smith's claim for hostile work environment. I concur with the majority's conclusion that Smith presented sufficient evidence regarding this claim to overcome a motion for judgment notwithstanding the verdict.

{¶ 87} A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule, or insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The utterance of the word "n____," particularly when made by a supervisor, may constitute evidence of severe discriminatory conduct. *Johnson v. United Parcel Serv., Inc.*, 117 Fed.Appx. 444, 454 (6th Cir.2004). Here, Smith testified that Holstein called him a "n____" and that co-workers and one of Superior's owners used the word "n____" within his hearing. Based on this evidence, I agree with the majority's decision to sustain the third assignment of error.

{¶ 88} Having reviewed all of Smith's arguments regarding the grant of judgment notwithstanding the verdict, I turn to the trial court's conditional decision to grant a new trial. Initially, I disagree with the majority's decision to review whether the trial court erred in determining, based on the manifest weight of the evidence, that a new trial was necessary. In *Jelinek v. Abbott Laboratories*, 164 Ohio App.3d 607, 2005-Ohio-5696 (10th Dist.), this court considered the plaintiff's argument that the trial court erred in granting a new trial, even though no assignment of error correlated with that argument. Here, not only did Smith not assign an error, he failed to even argue in the appellant's brief that the trial court erred in granting a new trial on manifest-weight grounds. I would not extend *Jelinek* to this situation.

{¶ 89} A motion for a new trial based on manifest-weight grounds presents a fundamentally different question to the trial court than a motion for judgment notwithstanding the verdict. In deciding a motion for a judgment notwithstanding the

verdict, the trial court cannot consider the weight of the evidence or the credibility of the witnesses. *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 31. The trial court, instead, determines whether the evidence, construed most strongly in favor of the non-movant, is legally sufficient to sustain the verdict. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, ¶ 23. Because this inquiry is one of law, appellate courts review it de novo. *Id.*

{¶ 90} When confronted with a motion for a new trial based on manifest-weight grounds, a trial court must engage in the very analysis forbidden in resolving a motion for judgment notwithstanding the verdict; it must weigh the evidence and consider the credibility of witnesses. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 27. Consequently, appellate courts may only reverse a ruling that the weight of the evidence demands a new trial upon a finding of an abuse of discretion. *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 448 (1996). Additionally, in reviewing such a ruling, appellate courts must view the evidence favorably to the trial court's ruling rather than to the original jury's verdict. *Id.*

{¶ 91} While I find the evidence of a hostile work environment legally sufficient to withstand a motion for judgment notwithstanding the verdict, I cannot find that the trial court's weighing of that evidence constitutes an abuse of discretion. With the exception of the incident with Holstein, Smith's evidence regarding the use of racial slurs has weaknesses: he failed to adduce evidence regarding when or how often he heard the word "n____" used in the workplace. In total, Smith only identified four individuals (besides Holstein) out of 250 Superior employees who had said "n____" within his hearing from 1998 to 2008. In none of those incidents was the speaker referring to Smith. Moreover, I cannot conclude, as the majority decision implicitly does, that Holstein used his gun to commit race-based harassment. As I explained above, the evidence does not support Smith's contention that Holstein used his gun to intimidate only African-Americans. Consequently, I disagree with the majority's conclusion that the trial court abused its discretion in granting Smith a new trial on his claim for hostile work environment.

{¶ 92} In conclusion, I would affirm the trial court's grant of judgment notwithstanding the verdict as to Smith's claims for race discrimination and retaliation. I would reverse the trial court's grant of judgment notwithstanding the verdict as to Smith's

claim for hostile work environment, but affirm the trial court's grant of a new trial on that claim.

_____